SOUTHERN ILLINOIS CLINIC, LTD., Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fifth District    No. 5—94—0027

Opinion filed August 22, 1995.

Jerome E. McDonald, of Campbell, Black, Carnine & Hedin, P.C., of Mt. Vernon, for petitioner.

J. Lawrence Sanders, of Sanders & Sanders, of Marion, for respondents Phyllis Bain and Jeannie O'Daniell.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Claudia E. Sainsot, Assistant Attorney General, of counsel), for respondent Human Rights Commission.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Respondents, Phyllis Bain and Jeannie O'Daniell (hereinafter complainants), filed complaints with the Illinois Department of Human Rights on March 17, 1988, alleging that petitioner, Southern Illinois Clinic, Ltd. (hereinafter the Clinic), unlawfully discriminated against them because of their age, when it discharged them on December 30, 1987. (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(a) (now 775 ILCS 5/2—102(a) (West 1994)).) After a public hearing, the administrative law judge (hereinafter judge) found in favor of complainants and awarded damages and attorney fees. The Clinic filed exceptions and complainants filed a response. Respondent, Illinois Human Rights Commission (the Commission), affirmed, adopted the recommended order and decision of the judge, and denied the Clinic's petition for rehearing. This cause comes to us upon the Clinic's petition for review pursuant to Supreme Court Rule 335 (134 Ill. 2d R. 335). The Clinic argues that (1) complainants failed to prove that their discharge was based upon their age, and (2) the finding of the trier of fact that the articulated nondiscriminatory reason for discharge was pretextual did not entitle complainants to a favorable decision but required that complainants put on additional evidence of discriminatory intent. We affirm.

I

Complainants were employed as telephone receptionists by the

Clinic before they were laid off on December 30, 1987, after approximately 15 years of service. Phyllis Bain was hired in 1971, and Jeannie O'Daniell was hired in March 1972. Bain was born on February 12, 1932, and was 55 years old at the time of her discharge. O'Daniell was born on February 18, 1930, and was 57 years old at the time of her discharge. Both were earning approximately $11,400 per year at the time they were terminated.

The Clinic was a medical corporation providing medical care to residents in the Mt. Vernon area. At the time of the hearing, Dr. Kenneth Peart, one of the Clinic's doctors and board members, was president and sole shareholder. The Clinic's board of directors was entirely comprised of doctors practicing at the Clinic. Prior to 1985, the Clinic employed between 17 and 20 physicians. By 1988, that number had dropped to only four physicians. Office visits of patients also declined during this period. In 1985, there were 45,303 office visits. In 1988, there were 25,456 office visits.

Around 1975, the reception area where complainants worked was reorganized into two areas. Complainants, along with Theresa Bell, who was also terminated on December 30, 1987, at the age of 41, no longer worked at the front desk, but in a small room connected to the front desk area. Those left at the front desk were required to file charts, answer the switchboard, and register patients. Those in a small room off to the side were called "telephone receptionists" and were required to answer the telephone and schedule appointments for patients to see doctors. When either group was not busy, it was to assist the other group in performing its tasks. It is generally accepted that both the receptionists and the telephone receptionists could perform each other's duties and did so occasionally.

Alice Dillon, Vickie Bledsoe, Anita McElroy, and Donna Overstreet worked as front desk receptionists and remained employed after complainants and Bell were dismissed. Alice Dillon and Vickie Bledsoe were in their 20's or 30's. Anita McElroy was in her 40's, and Donna Overstreet was 28. Alice Dillon was the supervisor of all the receptionists, including complainants and Bell. Ann Peart, Dr. Peart's wife, was hired to fill in temporarily after complainants and Bell were dismissed, in order to assist those who were not terminated on the proper protocol of their jobs. Connie Thomas, who had been terminated during an earlier layoff, was rehired after complainants were dismissed.

Jeannie O'Daniell testified that the Clinic provided its receptionists with good fringe benefits. Employees of the Clinic and their families received free medical care and hospitalization insurance. Additionally, employees who were employed at the Clinic for 10 years

received two weeks of paid vacation. Employees employed more than 15 years received three weeks of paid vacation, and employees employed more than 20 years received four weeks of paid vacation. The Clinic also awarded bonuses of $25 per year of service. Both complainants received bonuses of $425 in December 1987. When they were terminated, complainants and Theresa Bell had the longest tenure of any of the receptionists. Overstreet and McElroy had the least tenure of any of the receptionists.

The Clinic did not routinely give its employees formal evaluations, and neither complainant ever received an unfavorable evaluation or was advised that her performance was unsatisfactory or needed improvement. It is generally agreed that all receptionists received complaints from doctors or patients at one time or another.

In early 1987, the Clinic laid off 11 employees. In late 1987, eight additional employees were laid off. Complainants were in the second group of persons laid off. Jim Swafford, the Clinic's administrator, told complainants that the Clinic was eliminating its reception department. Complainants were the receptionists with the most seniority. Dr. Peart testified as an adverse witness for the Clinic. He testified that it was Jim Swafford's decision to terminate complainants and that the board of directors just "rubber-stamped" Swafford's decision. Dr. Peart stated that complainants were dismissed in part because the department was being phased out and in part because there were too many employees. He stated that at the time of their dismissal he did not know how old complainants were and did not know how long they had worked for the Clinic. Swafford only began working for the Clinic in September 1987. Bain testified that she had little contact with Swafford. Swafford was not subpoenaed by either of the parties and did not testify at the hearing.

During the Clinic's presentation of evidence, Dr. Peart testified that complainants were fired because they were the worst employees working in the reception area. He testified that numerous complaints were made by patients and staff, including himself, against complainants. When it came time to lay people off due to a "downturn" in the number of patients' visits, complainants were chosen to be let go because they were the worst employees in that area. Dr. Peart testified that his wife was hired in order to "rehabilitate" the remaining employees.

On the other hand, complainants called several witnesses who testified that complainants were competent employees. For example, Pat Chelf, a nurse who was employed by the Clinic for almost 17 years, testified that both complainants did an excellent job in the reception area and that after their termination, the reception area

did not run smoothly but was "helter skelter." Lisa Austin, who worked as a nurse for the Clinic from 1984 through 1988, testified that she worked closely with O'Daniell for three of those years and found O'Daniell's work to be excellent. The Clinic called no witnesses besides Dr. Peart.

Dr. Peart testified that by 1986 the economic condition of the Clinic was "shaky" and that the board of directors felt that there was too much overhead in the form of salaries. Dr. Peart testified that other than reducing the number of employees, the only other cost-cutting measure which was implemented was an attempt to reduce utility bills. According to Dr. Peart, the board did not reduce its purchases of medical equipment and continued to rent the entire clinic even though a portion of the clinic was vacant because of the decline in the number of physicians on staff. Dr. Peart did not know who owned the building that housed the Clinic in 1987. Originally, Dr. Alexander, the Clinic's founder, owned the building, and Dr. Peart took over ownership interest at a later time. By 1986, when Dr. Alexander retired, Dr. Peart took over running the Clinic and was in charge. After complainants were fired, the Clinic's pension plan owned the building. Dr. Peart did not know if any interest payments were made on the loans or if any attempt was made to reduce the interest payments.

The Clinic's corporate tax return for 1986 indicated that it paid $1,818,724 in salaries for that year and paid $414,438 to its corporate officers, who were the four remaining doctors. Dr. Peart testified that without having something to refresh his memory he could not say how much his own salary was in 1985, 1986, 1987, or 1988.

On July 17, 1991, the judge issued a 28-page recommended order and decision. The judge concluded that both complainants proved a *prima facie* case of discrimination. The judge found that three receptionists, Bledsoe, McElroy, and Overstreet, all significantly younger than complainants and with less seniority, were similarly situated in terms of job description. The judge found the Clinic's claim that it chose to terminate complainants because they were the worst receptionists unworthy of belief. The judge outlined many instances in which Dr. Peart's testimony was contradictory with regard to why complainants were terminated. The judge concluded that all other witnesses presently or formerly employed by the Clinic and who were not shown to hold any animosity toward the Clinic testified credibly that complainants were "fine receptionists." The judge also found that complainants testified "forthrightly that nobody ever complained to them any more than to any of the other receptionists." Accordingly, the judge concluded that the Clinic "did not provide

enough evidence to establish that its articulation was anything but a pretext for age discrimination."

On August 16, 1991, the Clinic filed with the Commission exceptions to the judge's decision. On September 27, 1993, the Commission issued a detailed order in which it affirmed the judge's findings of fact and conclusions of law. On October 27, 1993, the Clinic filed a motion seeking a rehearing before the full Commission. The Clinic contended that it had articulated a legitimate reason for terminating complainants and that the record "was void of any direct evidence" that the reasons stated for terminating complainants were a pretext for discrimination. The Commission denied the Clinic's motion for rehearing, and the Clinic timely filed its petition for review.

## II

In the instant case, the Clinic contends that complainants failed to prove that their discharge was based upon their age, after the Clinic presented evidence of a nondiscriminatory nature, namely, that there was a substantial overall reduction in the Clinic's work force due to a business downturn. The Clinic also contends that the finding of the judge that the articulated, nondiscriminatory reason for discharge was pretextual did not entitle complainants to a favorable decision but instead required complainants to then put on evidence of discriminatory intent. Complainants and the Commission respond that the trial court correctly found that the reasons articulated by the Clinic for its actions were a pretext for discrimination and that sufficient evidence was presented to infer that intentional discrimination against complainants occurred. We agree with complainants and the Commission.

We first note that the factual findings of an administrative agency are deemed *prima facie* correct and true. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110 (now 735 ILCS 5/3—110 (West 1994)).) A reviewing court must affirm the Commission's findings of fact unless it concludes that they are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1991, ch. 68, par. 8—111(a)(2) (now 775 ILCS 5/8—111(a)(2) (West 1994)); *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688.) It is not the function of a reviewing court to reweigh evidence or substitute its judgment for that of the trier of fact. *Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688.

Here, complainants alleged that the Clinic violated section 2—102(a) of the Illinois Human Rights Act (the Act) (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(a) (now 775 ILCS 5/2—102(a) (West 1994))). Illinois courts use the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII

of the Civil Rights Act of 1964 (42 U.S.C. § 2000E (1988)) and the Age Discrimination Employment Act of 1967 (29 U.S.C. §§ 621 through 634 (1988)) when analyzing employment discrimination actions brought under the Act. (*Zaderaka*, 131 Ill. 2d at 178, 545 N.E.2d at 687.) Under this analysis, a plaintiff may prove age discrimination in one of two ways. He or she may try to meet his or her burden by presenting direct or circumstantial evidence that age was a determining factor in the discharge, or the plaintiff may utilize the indirect, burden-shifting method of proof for Title VII cases, originally set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (*McCoy v. WGN Continental Broadcasting Co.* (7th Cir. 1992), 957 F.2d 368, 371, citing *Oxman v. WLS-TV* (7th Cir. 1988), 846 F.2d 448, 452.) The second method is more common.

■ In order to prevail under the *McDonnell Douglas* burden-shifting approach, the plaintiff must initially establish a *prima facie* case of discrimination. In order to establish a *prima facie* case, the plaintiff must show by a preponderance of the evidence that (1) she was a member of a protected class (age 40 or over), (2) she was doing the job well enough to meet her employer's legitimate expectations, (3) she was discharged or demoted, and (4) the employer sought a replacement for her. *Oxman*, 846 F.2d at 452-53; see also *McDonnell Douglas Corp.*, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824.

> "Federal courts have encountered difficulty applying *McDonnell Douglas prima-facie*-proof formulation to cases involving reductions in work force, because the employer rarely replaces the employee. Thus, the employee cannot satisfy the fourth element of the *McDonnell Douglas* formulation. The United States Court of Appeals for the Seventh Circuit established a modified version of the *prima-facie*-proof formulation for use specifically in reduction in force cases. [Citation.] Under this standard, the complainant must show (1) he was within the protected class; (2) he was performing according to his employer's legitimate expectations; (3) he was terminated or demoted; and (4) others not in the protected class were treated more favorably." *Clyde v. Human Rights Comm'n* (1990), 206 Ill. App. 3d 283, 292, 564 N.E.2d 265, 270.

"[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 67 L. Ed. 2d 207, 215, 101 S. Ct. 1089, 1093, quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824.) "When the plaintiff has proved a prima facie case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons

for its actions." (*Burdine*, 450 U.S. at 260, 67 L. Ed. 2d at 219, 101 S. Ct. at 1097.) "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons." *Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093.

■ In the instant case, the Clinic maintains that the last element was never adequately proved because several persons both over and under 40 years of age were terminated in January 1987, and several more in September 1987. Hence, according to the Clinic, the statistical evidence shows there was no discrimination against those over 40 years of age. We do not agree. Younger receptionists with less seniority, for example, Donna Overstreet and Vickie Bledsoe, were retained, while the oldest receptionists and the ones with the most seniority were terminated. Moreover, Connie Thomas, a receptionist who was laid off in January 1987, was rehired after complainants were terminated. Accordingly, we believe the fourth element was proven by a preponderance of the evidence.

■ The judge went on to determine that the reasons espoused by the Clinic for terminating complainants were pretextual. Given the facts of the present case, we cannot say that the judge's determination in this regard was against the manifest weight of the evidence. Dr. Peart's testimony was clearly contradictory concerning why complainants were terminated. Complainants, on the other hand, presented numerous witnesses who testified that they performed not only within the legitimate business expectations of the Clinic but, in fact, were two of the best receptionists in the area. The fact that Dr. Peart's wife had to be hired to "rehabilitate" the remaining receptionists creates a strong inference that complainants were employees whose absence caused a turmoil within the Clinic's business.

Once a finding of pretext has been made, the issue arises, as it does here, whether a finding of pretext mandates judgment for complainants or whether something more is required. The Clinic insists that complainants bore the burden of proof in showing discrimination based upon their ages and that the judge never reached the issue of discriminatory intent. The Clinic cites *St. Mary's Honor Center v. Hicks* (1993), 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742, in support of its contention that the judge's rejection of its proffered reasons for dismissal did not *compel* a finding of intentional discrimination. Accordingly, the Clinic insists that the judge's decision was against the manifest weight of the evidence because complainants failed to present any evidence of discriminatory intent, once the Clinic articulated a nondiscriminatory reason that better

employees than complainants were retained when the Clinic determined a reduction in force was necessary due to the economic downturn. Complainants respond, and we agree, that the decision of the judge and the subsequent decision of the Commission are not contrary to *Hicks.*

In *Hicks*, the employee, a black male, was hired by the employer, St. Mary's Honor Center, as a correctional officer in August 1978 and was promoted to the position of shift commander in February 1980. Beginning in March 1984, the employee became the subject of repeated and increasingly severe disciplinary actions. Eventually, he was demoted and discharged due to these disciplinary actions. The employee subsequently sued for racial discrimination. After a full bench trial, the district court found in favor of the employer, finding that the employee failed to meet his ultimate burden of proving that his race was the determining factor in the decision to dismiss him. (See *Hicks v. St. Mary's Honor Center* (E.D. Mo. 1991), 756 F. Supp. 1244.) According to the district court, although the employee proved the existence of a crusade to terminate him, he did not prove that the crusade was racially, rather than personally, motivated. The United States Court of Appeals for the Eighth Circuit reversed the district court and remanded the case. (See *Hicks v. St. Mary's Honor Center, Division of Adult Institutions of the Department of Corrections & Human Resources* (8th Cir. 1992), 970 F.2d 487.) The court of appeals reasoned that because the district court found that the employee satisfied his burden of proving pretext, the employee was entitled to judgment as a matter of law. (*Hicks*, 970 F.2d at 492.) The United States Supreme Court granted *certiorari* to determine whether a finding of pretext entitled the employee to a judgment as a matter of law in his favor, absent a finding of intentional discrimination. According to the Supreme Court, rejection of the employer's proffered reasons permits the trier of fact to infer the ultimate fact of intentional discrimination but does not *compel* judgment for the employee. (*Hicks*, 509 U.S. at 511, 125 L. Ed. 2d at 419, 113 S. Ct. at 2749.) The Supreme Court reiterated its long-time stand that a Title VII plaintiff at all times bears the "ultimate burden of persuasion." (*Hicks*, 509 U.S. at 511, 125 L. Ed. 2d at 419, 113 S. Ct. at 2749.) Most importantly, for the situation presented herein, the Supreme Court stated:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if this belief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." (*Hicks*, 509 U.S. at 511, 125 L. Ed. 2d at 418, 113 S. Ct. at 2749.)

*Hicks* indicates that an employee *may* prevail in a discrimination case by establishing a *prima facie* case, along with persuading the trier of fact that the employer's proffered nondiscriminatory reasons for the discharge should not be believed. This permits the trier of fact to infer the ultimate fact of intentional discrimination. (See *Anderson v. Baxter Healthcare Corp.* (7th Cir. 1994), 13 F.3d 1120, 1123-24; *DeMarco v. Holy Cross High School* (2d Cir. 1993), 4 F.3d 166, 170; *Saulpaugh v. Monroe Community Hospital* (2d Cir. 1993), 4 F.3d 134, 142.) The ultimate finding of discrimination is a question of fact for the fact finder. *Strauss v. Microsoft Corp.* (S.D.N.Y. 1994), 856 F. Supp. 821.

In the instant case, Jim Swafford told complainants that the reception department was being phased out and, consequently, they were terminated. Despite this alleged phase-out, Dr. Peart's wife was hired for five months in order to "rehabilitate" those left in the reception area. In addition to Mrs. Peart's subsequent employment, Connie Thomas was rehired by the Clinic after complainants were terminated. The record is replete with references to inconsistencies in Dr. Peart's testimony as to why complainants were terminated. The judge pointed out numerous inconsistencies and ultimately concluded that the Clinic's proffered reasons were pretextual. On the record before us we cannot say that this finding was against the manifest weight of the evidence.

As to whether there was a finding by the judge on the ultimate issue of discrimination, in accordance with *Hicks*, we unequivocally believe there was. Both the judge's and the Commission's rulings explain in great detail why the evidence presented by complainants that they were hard-working and conscientious employees was more compelling than Dr. Peart's uncorroborated testimony that complainants were the worst employees of the reception area. Complainants submitted compelling evidence through their own testimony and that of other Clinic employees that younger employees, with less seniority, were treated more favorably in that they were retained while complainants were dismissed. The judge specifically stated in this regard:

> "6. Respondent's articulation that it chose Complainants for layoff because they were the worst receptionists and more people complained about them than any of the others was unworthy of belief. Complainants proved by a preponderance of the evidence that Respondent's articulation was a pretext *for unlawful discrimination on the basis of age.*" (Emphasis added.)

There is no other inference to be drawn but that, in reducing employees within the reception area, the Clinic chose to keep the youngest

and those with the least seniority, thereby discriminating against complainants. The instant case exemplifies the Supreme Court's language that "[t]he factfinder's disbelief of reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." (*Hicks*, 509 U.S. at 511, 125 L. Ed. 2d at 418, 113 S. Ct. at 2749.) Accordingly, we agree with the Commission's determination that the Clinic's proffered reasons for complainants' discharge were pretextual. We also find that complainants met the ultimate burden of proving age discrimination.

For the foregoing reasons, the decision of the Illinois Human Rights Commission is affirmed.

Affirmed.

MAAG, P.J., and HOPKINS, J., concur.