FIFTH DIVISION

FILED: 11/7/97

No. 1-96-2687

CHRIST HOSPITAL AND MEDICAL CENTER, ) APPEAL FROM THE

) ILLINOIS HUMAN RIGHTS

Petitioner-Appellant, ) COMMISSION

)

v. ) Charge No. 1984CF2073

)

ILLINOIS HUMAN RIGHTS COMMISSION, )

THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS,)

and CHARLES HUGHES, )

)

Respondents-Appellees. )

JUSTICE HOFFMAN delivered the opinion of the court:

This appeal arises out of a decision of the Illinois Human Rights Commission (Commission) finding that petitioner, Christ Hospital, discriminated against respondent, Charles Hughes, in denying Hughes a promotion.  Christ Hospital argues that the Commission (1) made a determination that was contrary to the manifest weight of the evidence; (2) applied an incorrect legal standard; and (3) awarded damages that were unsupported by the evidence.

 Hughes, who is black, was hired by the hospital in early June 1980, as a third-shift housekeeping supervisor.  On April 12, 1984, he filed a petition with the Department of Human Rights alleging that the hospital had discriminated against him based upon his race.  The Department subsequently brought a complaint before the Commission alleging that, beginning in October of 1983, the hospital had subjected Hughes to unequal terms and conditions of employment, by mandating that he sign in and out while not requiring the same of similarly-situated non-black managers; giving him an unfounded poor performance evaluation; demoting him for no apparent reason; and by denying him a promotion to quality control officer.  

After a hearing, the administrative law judge (ALJ) concluded that the hospital had racially discriminated against Hughes in denying him the promotion to quality control officer.  The ALJ found insufficient evidence to support Hughes's remaining claims.  The hospital filed exceptions to the finding of discrimination, and the Commission affirmed the ALJ's decision.  This appeal followed.

The evidence supporting the ALJ's finding of discrimination is summarized below.  At the time Hughes was hired, his immediate supervisor was Kevin Darling, the head of housekeeping.  At all times relevant, Coletta Neuens was the hospital's associate administrator and Kevin Scanlan was the director of human resources, who reported to Neuens.  Part of Neuens's responsibilities were to oversee the housekeeping administrators.  She also had the ultimate authority over any decisions regarding Hughes's employment.

When he began at the hospital, Hughes's duties included  shining floors, delivering linens and removing garbage.  In December of 1982, Hughes was promoted to housekeeping operations manager.  In that position, he was required to travel between three facilities to supervise housekeeping employees: the hospital itself, its corporate offices in Oak Brook, and Bethany Hospital, which was owned and operated by the hospital.  Hughes was reimbursed for his travel to and from these facilities.

In late 1983, the hospital commenced an investigation into alleged irregularities in the housekeeping department.  Scanlan, who took part in the investigation along with Neuens, testified that they had received reports regarding petty cash fund irregularities, the submission of excessive travel expense reports, and the alleged use of hospital employees and supplies to clean locations not owned by the hospital.  The investigation initially focused on Darling but later was expanded to include Hughes and another housekeeping operations manager, Thomas Walsh.  Darling and Walsh, both of whom were white, were suspended without pay during the investigation based upon suspicion of petty cash irregularities.  Darling's duties were temporarily assumed by assistant administrator Charles Jones.  Hughes remained at work during the investigation.

The investigation inquired into claims that Hughes had submitted falsified mileage reports for his trips to Bethany, and that he was working for another employer during the hours he was supposedly working for the hospital.  In late fall 1983, Jones notified Scanlan that the investigation had disclosed that Hughes was overpaid more than $500 in travel expenses, and that he had furnished the hospital with a social security number that was different than that given to his prior employer.  When confronted with the overpayment, Hughes acknowledged responsibility and made restitution to the hospital.  According to Hughes, he had been instructed by Darling to take indirect routes to the other sites due to construction on the main routes.

In December of 1983, Jones gave Hughes a poor performance evaluation, and one month later, while the investigation remained pending, Jones wrote Scanlan expressing his lack of confidence in Hughes based on the investigation.  Jones recommended to Neuens that Hughes and Walsh be terminated based upon "their performance as managers in connection with their involvement" in the matters under investigation.  Neuens rejected the recommendation, finding it unwarranted under the hospital's human resources and personnel policies.

The investigation ultimately revealed insufficient evidence against Hughes to warrant termination or other disciplinary action.  In addition, Hughes contested his December 1983 evaluation, and after an objective review of the matter, Neuens determined that the evaluation should be changed to reflect competent performance.  Hughes was given a salary increase and full retroactive pay.

In early 1984, the hospital reorganized several of its departments, including housekeeping.  A plan was devised calling for the elimination of the operations manager positions held by Hughes and Walsh, and the creation of a new position, that of quality control officer.  Effective May 13, 1984, Hughes was demoted to third-shift supervisor; Walsh resigned prior to being demoted.  

In the meantime, in February 1984, the hospital posted the opening for the position of quality control officer.  According to Neuens, the hospital had a "bidding" policy, under which all new positions were posted on an employee board, and employees were required to "bid" on those they desired.  Hughes applied for the position of quality control officer, and remained the sole applicant.  The job's responsibilities included ensuring the safe use of toxic chemicals throughout the hospital, conducting tests to assure compliance with federal regulations, and providing in-service training programs for housekeeping and other personnel.

In April 1984, the hospital denied Hughes the position.  Both Neuens and Scanlan testified that the reason for the refusal was Hughes's lack of sufficient knowledge and experience regarding toxic cleaning substances.  Additionally, Neuens testified that she had a policy against promoting anyone who was under investigation.   However, on further examination, Neuens admitted that she had no idea when the investigation concluded or whether it was still in progress when she made her decision.  She further acknowledged neither speaking with Hughes personally regarding the claims, nor independently verifying the truth of the allegations before deciding not to promote him.

In addition, on cross-examination as to Hughes's supposed lack of qualifications, both Neuens and Scanlan admitted being aware that Hughes had been working with the toxic cleaning chemicals in question since 1980, and training the cleaning staff on how to use them.  Neuens also admitted that the new position had substantially the same duties as Hughes's position at the time.

The quality control officer position remained open until August 1984, when it was withdrawn without being filled.  In October 1984, the hospital created the position of quality control training coordinator, the focus of which was upon training rather than toxic chemical use.  The position was awarded to Judith Lake, a white woman who was subordinate to Hughes.  

It was undisputed that Hughes never applied for the position of quality control training coordinator.  According to Hughes, this was because the position was never posted.  Neuens, however, testified that the position had been posted.

The Commission issued a memorandum order affirming the recommended order and decision of the ALJ.  The Commission found that the hospital's proffered reasons for refusing to promote Hughes to the position of quality control officer were unworthy of belief.  It observed that the hospital had a strong policy of promoting from within; that Hughes was qualified and had filed the sole application; and last, that Neuens never attempted to independently verify whether Hughes was suitable for the position. 

On appeal, the hospital first challenges the Commission's finding that its proffered reasons for refusing to promote Hughes were pretextual.

On appellate review, the findings and conclusions of an administrative agency on questions of fact are held to be 
prima
 
facie
 true and correct.  735 ILCS 5/3-110 (West 1994).  The Commission's factual findings must be affirmed unless the court concludes that they are against the manifest weight of the evidence.  
Raintree Health Care Center v. Illinois Human Rights Commission
, 173 Ill. 2d 469, 479, 672 N.E.2d 1136 (1996); 
Southern Illinois Clinic v. Human Rights Commission
, 274 Ill. App. 3d 840, 846, 654 N.E.2d 655 (1995).  Determinations as to the credibility of witnesses and the weight to be given their testimony are reserved for the agency, and it is not this court's function to substitute its judgment on those issues.  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992); 
Southern Illinois Clinic
, 274 Ill. App. 3d at 846.  However, such deference is not afforded to the agency's conclusions of law and statutory construction; this court exercises independent review over such questions.  
Raintree
, 173 Ill. 2d at 479.  

In analyzing claims of racial discrimination under the Act, courts employ a three-step approach set forth in 
McDonnell Douglas Corp. v. Green
, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and adopted by the supreme court in 
Zaderaka v. Illinois Human Rights Commission
, 131 Ill. 2d 172, 545 N.E.2d 684 (1989).  First, the plaintiff must establish by a preponderance of the evidence a 
prima
 
facie
 case of unlawful discrimination.  Once the 
prima
 
facie
 case is established, it gives rise to a rebuttable presumption that the employer unlawfully discriminated against the plaintiff.  Second, in order to rebut the presumption, the employer must articulate, but not prove, a legitimate, non-discriminatory reason for the action taken.  
Zaderaka
, 131 Ill. 2d at 179, citing 
Texas Department of Community Affairs v. Burdine
, 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097 (1981).  Finally, if the employer carries its burden, the presumption of unlawful discrimination falls and the plaintiff must then prove that the employer's articulated reason was not its true reason, but a pretext for unlawful discrimination.  
Zaderaka
, 131 Ill. 2d at 179.  Although the presumption of discrimination operates to shift the burden of production to the employer, the burden of persuading the trier of fact that the employer intentionally discriminated remains with the plaintiff throughout the case.  
St. Mary's Honor Center v. Hicks
, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 416, 113 S. Ct. 2742, 2747 (1993); 
Zaderaka
, 131 Ill. 2d at 179.  The question of whether or not a stated reason was pretextual is one of fact.  
Zaderaka
, 131 Ill. 2d at 180.

The hospital's reasons for denying Hughes the job were that he was unqualified because he lacked the requisite knowledge and experience regarding toxic cleaning substances; and that he had been the subject of an internal investigation and thus was not suitable for promotion to a supervisory position.  The Commission concluded that the ALJ properly could have found that these reasons were unbelievable and were not the true reasons for denying Hughes the promotion.  A review of the record fails to show that this finding was against the manifest weight of the evidence.

On the question of whether or not Hughes was qualified for the job, both Neuens and Scanlan contradicted themselves: while initially testifying that he lacked adequate knowledge or experience, both witnesses admitted that Hughes had been working with the very chemicals in question since 1980, and that he had primary responsibility for training employees in the safe use of these chemicals.  Further, they admitted that the duties of the quality control officer were essentially identical to those that had been performed by Hughes when he was operations manager.  Although Neuens vaguely indicated that the new position "had a greater expectation" and was derived from new federal regulations, when pressed, she was unable to convincingly explain how this impacted upon Hughes's qualifications.  

Neuens also attributed the decision to the fact that Hughes was under investigation.  However, the Commission pointed out Neuens's specific testimony that the investigation failed to produce evidence to warrant termination or disciplinary action; thus, the Commission found, the ALJ could reasonably have rejected Neuens's assertion that the investigation formed the basis for her decision not to promote Hughes.  We find that Neuens's testimony supported this finding, and there is no basis to disturb it.

We do find reversal warranted, however, based upon the hospital's contention that the Commission applied an incorrect standard.  Specifically, the hospital argues that the Commission proceeded to rule for Hughes based solely on the finding that its proffered reasons were unworthy of belief, and never reached the question of whether they were pretexts for racial discrimination. 

Under the holding in 
Hicks
, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993), followed by this court in 
Southern Illinois Clinic
, 274 Ill. App. 3d 840, and 
Cisco Trucking Co. v. Human Rights Commission
, 274 Ill. App. 3d 72, 653 N.E.2d 986 (1995), a finding that the employer's proffered reasons were pretextual does not automatically compel judgment for the employee.  Rather, the burden rests with the employee to prove that the reasons were pretexts for racial discrimination.  
Hicks
, 509 U.S. at  511, 125 L. Ed. 2d at 419, 113 S. Ct. at 2749.  The factfinder's disbelief of the reasons advanced by the defendant may, together with the elements of the 
prima
 
facie
 case, suffice to create an inference of discrimination.  
Hicks
, 509 U.S. at 511, 125 L. Ed. 2d at 418, 113 S. Ct. at 2749.  However, the inquiry cannot end merely because the employee has succeeded in discrediting the employer's proffered reasons; the employee must present sufficient evidence to permit a finding that the employer's proffered reasons masked intentional racial discrimination rather than some other legitimate, though not necessarily commendable, motive.  Such a rule necessarily follows from the premise that the employee retains the burden of persuasion throughout the case.  See 
Hicks
, 509 U.S. at 511, 125 L. Ed. 2d at 419, 113 S. Ct. at 2749; 
Cisco
, 274 Ill. App. 3d at 76.

In its memorandum order, the Commission painstakingly recounts the inconsistencies in Neuens's and Scanlan's testimony, discrediting the hospital's proffered reasons for denying Hughes the promotion.  However, after finding that the hospital's reasons for denying Hughes the promotion were pretextual, the Commission, without further findings of fact, concluded that the hospital discriminated against Hughes on the basis of race.

In fact, the record indicates that Hughes was treated equally throughout his employment.  There is evidence that he received praise, a promotion and a pay increase for good work.  Although he became the subject of an investigation, he was treated no differently than non-black employees from housekeeping who were also being investigated.  When he received an unfair performance evaluation, Neuens conducted her own investigation and then revised the evaluation to indicate competent performance, giving Hughes a commensurate raise and back pay. 

Hughes argues that there was circumstantial evidence supporting a finding of discrimination.  Namely, he asserts that (1) he was the sole applicant for the position, and was qualified; (2) the hospital rejected him despite a strong policy of promoting from within; and (3) it subsequently proceeded to rewrite the position as "quality control training coordinator", and then, without posting it, award the new position to a less-qualified white woman.

Of these factors, we find that the latter arguably could justify an inference of racial discrimination.  However, the Commission made scant findings on this point, and in fact, didn't even refer to it as a basis for its final decision.  Although Hughes was never offered the job of quality control training coordinator, it was undisputed that he never applied for the position, despite a hospital requirement that employees "bid" on all positions they desire.  Although Hughes maintained that the hospital never posted the position, this was contradicted by Neuens, who testified that it was posted.  The Commission failed to resolve this issue.

The remaining points cited by Hughes, that the hospital had a strong policy of internal promotion, that he had the requisite knowledge and experience for the job, and that he was the sole applicant, simply prove that the hospital did not desire to give Hughes the promotion.  These facts, standing alone, do not support an inference of racial discrimination.  
Cf
. 
Hicks
, 509 U.S. at 508-09, 125 L. Ed. 2d at 417, 113 S. Ct. at 2748.   

Based on the foregoing, we conclude that the Commission failed to make any factual findings in support of its conclusion that the hospital discriminated against Hughes based on his race.  In particular, it failed to properly consider the question of whether or not the position of quality control training coordinator was properly posted to be bid upon by employees.  Accordingly, we exercise our power under Supreme Court Rule 335(i)(2) (155 Ill. 2d R. 335(i)(2)), and section 3-111(a)(7) of the Code of Civil Procedure (735 ILCS 5/3-111(a)(7) (West 1994)), and reverse and remand this case to the Commission for the taking of further evidence necessary for a resolution of the issue of whether the hospital's reasons for denying Hughes a promotion to the position of quality control officer were a pretext for racial discrimination.  Because of our disposition, we need not address the damage issue raised by the hospital.

Reversed and remanded with directions.

HARTMAN, P.J., and HOURIHANE, J., concur.