H. LEON CLYDE, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—90—0156

Opinion filed December 20, 1990.—Rehearing denied January 9, 1991.

Joseph C. Honan, of Bloomington, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Claudia E. Sainsot, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

J. Stephen Poor and Marcia A. Mahoney, both of Seyfarth, Shaw, Fair-

weather & Geraldson, of Chicago, and Theodore R. Johnson, of Peoria, for respondent Caterpillar, Inc.

JUSTICE KNECHT delivered the opinion of the court:

The Illinois Department of Human Rights filed a complaint on behalf of Leon Clyde, complainant, against Caterpillar, Inc., alleging Caterpillar violated section 2—102(A) of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A)). The administrative law judge (ALJ) found, as a matter of law, complainant failed to establish a *prima facie* case of discrimination on the basis of age. (*In re H. Leon Clyde* (May 9, 1989), ____ Ill. Hum. Rights Comm'n Rep. ____ (HRC No. 1986—CF—1103) (hereinafter ALJ's recommended decision of May 9, 1989).) The Illinois Human Rights Commission (HRC) concluded the ALJ's decision was not against the manifest weight of the evidence and affirmed. (*In re H. Leon Clyde* (Nov. 13, 1989), ____ Ill. Hum. Rights Comm'n Rep. ____ (HRC No. 1986—CF—1103) (hereinafter HRC's order of Nov. 13, 1989).) The complainant appeals this decision pursuant to Supreme Court Rule 335 (107 Ill. 2d R. 335). We affirm.

The following evidence was adduced at the hearing before the ALJ. Caterpillar divided accounting functions into two areas: general accounting and cost accounting. General accounting included general ledger bookkeeping, tracking financial results, financial reporting, procedures, budgetary, and forecasting work. Cost accounting involved product costing, investment analysis, make-buy-import studies, and other special cost projects. Different skills were required to work in each area.

Caterpillar established a procedure for downgrading management accounting employees during a reduction in force, which occurred when the company lacked sufficient business to employ the entire work force. After the reduction and restructuring of the work force, surplus management accounting employees were first tested and placed in the highest-rated job for which they were qualified without training. The phrase "without training" meant the employee could move into the new job and perform it after only two or three days' familiarization.

The second consideration in the downgrade procedure involved seniority. The employee's date of entry into his job classification determined seniority and was synonymous with service. The employee with the earliest entry date was allowed to displace or "bump" less senior employees.

David Schappaugh, personnel services supervisor at Caterpillar's

Pontiac, Illinois, facility from January 1982 through February 1987, testified the most important of the two criteria was whether an employee could perform a job without being trained. This involved a "judgment call" by line managers. Experience was relevant only as to whether the employee had the knowledge and skill to perform the job without being trained.

Complainant began working for Caterpillar in 1967 as a production accounting clerk. He was promoted to the management payroll and entered the accountant job classification in September 1968. In 1978 he was transferred to the Pontiac facility, where his job classification was general accountant A-150.

In 1982, respondent offered Clyde a position as a cost accountant, but Clyde declined the offer. Had he accepted the position, Caterpillar would have trained him for the job, including Statistical Analysis System (SAS) training. Thus, Schappaugh testified, Caterpillar's offer of the job to complainant at that time was not an indication he was qualified to do the work, because additional training would have been necessary.

Complainant later applied for SAS training and was scheduled for a class in the fall of 1984. One to two weeks before the class his supervisor, Cloyce Burcham, asked him to step aside and let another employee, Mr. Schnake, take the class. Schnake was younger than Clyde. Burcham told the complainant he would be rescheduled for the class. In December 1984 or January 1985, Clyde asked for admission to the March 1985 SAS class. He was told his job no longer required the training and thus he would not be allowed to attend.

Caterpillar's policy was to allow only those who would use SAS training in their jobs to attend the training sessions. Clyde testified Thomas Stanley took the SAS class but did not use the training in his job. Stanley's testimony corroborated Clyde's assertion. Stanley worked as a budget accountant at the Pontiac facility from June 1984 through August 1985 and had SAS training in September 1984. David Pruski, apparently an accounting supervisor, testified he believed Stanley received SAS training at the Davenport facility, just before transferring to Pontiac.

During his tenure at Caterpillar, the complainant worked only in the general accounting division. He occasionally performed cost-accounting tasks, but these did not involve the kinds of tasks performed by accountants in the cost-accounting division, according to Gregory Bower, cost- and investment-analysis supervisor, and Pruski. Complainant disputes their testimony on this point.

In 1984 all management employees, including Clyde, received no-

tice from Caterpillar of an impending reduction in the work force. Complainant discussed alternative job possibilities, particularly a move to the cost-accounting division, with Burcham. Burcham and Clyde talked again in the spring of 1985 when Burcham informed Clyde he could not move to the cost-accounting department because he lacked SAS training.

Caterpillar implemented the reduction in its work force in August 1985. Complainant's job was eliminated and he was downgraded to a methods-analyst position. He was 45 years old at the time. The downgrade removed complainant from the management payroll and placed him on the weekly payroll, resulting in approximately $1,000 less per month in wages, loss of medical benefits offered exclusively to management personnel, and the loss of income from the employee-employer investment plan from which complainant had to withdraw due to the decrease in his disposable income. The employee Clyde displaced, or "bumped," was Brad Beabout, age 30. Twenty-two management employees, including Clyde, were downgraded or laid off in August 1985. All were younger than Clyde. Stanley, a 28 year old, was also laid off.

At the time of the downgrade, there were four cost-accounting positions at the Pontiac facility, held by Steve Klisares, age 28, Lillie Davis, age 34, Phillip Weingart, age 26, and Lester Simms, age 28. All four were less senior to Clyde in the accountant classification. Weingart and Simms entered the classification in October 1985; thus, the HRC and complainant describe them as having probationary status in August 1985. Weingart received SAS training in March 1985 and Davis and Simms received SAS training in February 1986.

Pruski testified Clyde was downgraded, rather than bumping an employee in cost accounting, because he could not perform any of the cost jobs without at least 1½ months' training. Specifically, Pruski testified Simms worked to develop rates for a burden-allocation system, which went to the corporate system for product costing. Complainant lacked familiarity with Caterpillar's estimated-cost system, used in costing, and with the local system for preproduction costing, a system unique to the Pontiac facility. It had taken Simms about 1½ months to become familiar with the required computer operations. Thus, he could not do Simms' job after only two or three days on the job.

Klisares brought in a production reporting system for the factory, also known as a cost-effectiveness system, and for implementing the system and training users. This was a unique system which had taken Klisares several months to learn. Because Clyde lacked experience

with cost-effectiveness systems, and because the project was of limited duration, he was not qualified to do the work done by Klisares.

Weingart was responsible for normals, that is, developing cost rates based on a budget. The rates are put into a system to determine product costing. Weingart also worked to determine ways to reduce the company's organizational structure and costs. The computer system, SAS, used in performing the normals function took about one week of training and three weeks of hands-on use to operate it properly. Because complainant lacked necessary computer skills and SAS training, he could not perform the work Weingart did without training. Pruski testified he did consider Clyde's experience with normals work, but believed the experience was not useful as the company now uses microcomputers to do the job. Pruski testified SAS training alone would not have qualified Clyde for the normals job.

Davis did investment analysis, make-buy-import studies, and worked on a cost-reduction team for one product. She worked on both the general and local computerized estimated-cost system, and had had 1½ months' training to become familiar with the system. Complainant could not do Davis' job because he had no knowledge of the estimated-cost system used for product costing and investment analysis. Although Clyde had prior investment experience, he could not satisfactorily perform the job in 1985 without training.

Complainant did not meet the "without training" criteria for the cost positions and had to be downgraded to the methods-analyst position. Complainant was downgraded despite his seniority to Klisares, Davis, Weingart, and Simms. The ALJ further found that in the accounting department, several employees who were younger than complainant (Stanley, Deitz, and Liptach, all in their 20's) were laid off—and two employees older than complainant, Vaughn and Gallup, were retained.

The ALJ concluded, as a matter of law, complainant failed to establish a *prima facie* case of age discrimination. Caterpillar's denial of SAS training for Clyde was not shown to have been based on age. The ALJ found Caterpillar did not discriminate against Clyde when he was not allowed to displace Weingart. Further, as a new employee, Weingart was not governed by the downgrade policy but was entitled to 1½ months' training on the job.

> "While Complainant may disagree with how Respondent interprets its policy, Complainant has still failed to show that his age was the reason Respondent's [*sic*] interpreted its policy as it did. Respondent's policy has not been shown to have been interpreted and applied any differently to Complainant as it was

to other employees.

Since Complainant could not perform the job of the A-150 cost accountants without being trained, Complainant has not demonstrated that he was able to meet the legitimate expectations of his employer for the positions at issue. Consequently, Complainant has failed to establish a prima facie case of age discrimination." ALJ's recommended decision of May 9, 1989, slip decision at 13.

The HRC affirmed, adopted, and incorporated the ALJ's recommended order and decision in its order and decision issued November 13, 1989, wherein the HRC concluded:

"After reviewing the record, it appears clear that the respondent may have been justified in retaining the complainant as a management accountant. It is also clear, however, that the complainant could not have performed any of the existing management accountant positions without additional training, and that the respondent had a policy which held that management employees who were subject to a reduction in force could not 'bump' other employees unless they could do their jobs without additional training. Under these circumstances, it was reasonable for the Administrative Law Judge to find that the complainant had not proven discrimination. Under Section 8—107(E)(2) of the Human Rights Act, the Commission may not overturn the factual findings of the Administrative Law Judge unless they are against the manifest weight of the evidence. Under this standard, we find that the Recommended Order and Decision in this case must be affirmed." HRC's order of Nov. 13, 1989, slip at 4.

The factual findings of an administrative agency are deemed *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) A reviewing court must affirm the HRC's findings of fact unless the court concludes they are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2); *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688.)

" 'A decision is contrary to the manifest weight of the evidence only when, after reviewing the evidence in a light most favorable to the administrative agency, the court determines that no rational trier of fact could have agreed with the agency's decision [citation], because an opposite conclusion is clearly evidence [*sic*]. [Citation.] If the record contains any evidence supporting the administrative agency's decision, the decision must

be sustained on review.' (*Bultas v. Board of Fire & Police Commissioners* (1988), 171 Ill. App. 3d 189, 193-94, 524 N.E.2d 1172, 1174-75.)" (*Quincy School District No. 172 v. Human Rights Comm'n* (1990), 197 Ill. App. 3d 694, 699-700, 555 N.E.2d 21, 25-26.)

The reviewing court cannot reweigh the evidence or substitute its judgment for that of the trier of fact. *Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688.

■■ Complainant alleged Caterpillar violated section 2—102(A) of the Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A)) and sought to prove disparate treatment. Illinois courts use the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.* (1988)) and the Age Discrimination in Employment Act of 1967 (29 U.S.C. §§621 through 634 (1988)) in analyzing employment discrimination actions brought under the Act. (*Zaderaka*, 131 Ill. 2d at 178, 545 N.E.2d at 687.) As stated in *Zaderaka*:

"The Supreme Court set out a three-part analysis in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff. Second, to rebut the presumption, the employer must articulate, not prove (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097), a legitimate, nondiscriminatory reason for its decision.

Finally, if the employer carries its burden of production, the presumption of unlawful discrimination falls and plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination. This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff. (*Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095.)" *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d at 687.

■■ ■ Under the analytical framework adopted by the United States Supreme Court in *McDonnell Douglas Corp.*, a complainant bears the burden of proving a *prima facie* case by showing: (1) he was a member of the protected class; (2) he was doing his job well enough to meet the employer's legitimate expectations; (3) despite his per-

formance, he was discharged; and (4) the employer sought a replacement for him. (*Oxman v. WLS-TV* (7th Cir. 1988), 846 F.2d 448, 452-53; see also *McDonnell Douglas Corp.*, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824 (describing initial burden of establishing *prima facie* case of racial discrimination in context of suit where complainant was laid off and, after leading demonstrations against employer, was not rehired upon applying in response to employer's advertisement).) "Under the *disparate treatment* theory, proof of discriminatory motive is critical, although it may be inferred in some situations from differences in treatment. (*International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 415 n.15, 97 S. Ct. 1843, 1854 n.15.)" (*Burnham City Hospital v. Human Rights Comm'n* (1984), 126 Ill. App. 3d 999, 1003, 467 N.E.2d 635, 637.) This is the standard the ALJ required Clyde to meet.

Federal courts have encountered difficulty applying the *McDonnell Douglas prima-facie*-proof formulation to cases involving reductions in work force, because the employer rarely replaces the employee. Thus, the employee cannot satisfy the fourth element of the *McDonnell Douglas* formulation. The United States Court of Appeals for the Seventh Circuit established a modified version of the *prima-facie*-proof formulation for use specifically in reduction in force cases. (*Oxman*, 846 F.2d at 453-54.) Under this standard, the complainant must show (1) he was within the protected class; (2) he was performing according to his employer's legitimate expectations; (3) he was terminated or demoted; and (4) others not in the protected class were treated more favorably. *Oxman*, 846 F.2d at 455.

The ALJ concluded, as a matter of law, Clyde failed to establish a *prima facie* case of age discrimination. Clyde was within the protected class as he was 45 years old in August 1985. He was adversely affected by the downgrade and, despite his seniority, was not allowed to displace four younger employees. The ALJ wrote, "Based on these facts, Complainant has presented sufficient evidence that these persons were treated more favorably." (ALJ's recommended decision of May 9, 1989, slip decision at 9.) The complainant was not, however, able to meet Caterpillar's legitimate expectations of job performance in a cost-accounting position without training. This, rather than his age, caused him to be downgraded and, according to the ALJ, kept him from proving a *prima facie* case.

The HRC's order and decision focused not on the *prima facie* case, but on whether Clyde proved Caterpillar's reasons for downgrading him were pretextual.

"In a case such as this, where the respondent's reason for the employment transaction in issue has been fully presented in the evidence, it is not usually necessary for a reviewing panel to determine whether a prima facie case has been presented. Because the main function of the presentation of a prima facie case is forcing the respondent to articulate its reason for the employment transaction in issue, once that reason has come out, the reviewing panel can normally proceed to determine whether that reason has been proven to be a pretext for discrimination. *United States Postal Service Board of Governors v. Aikens*[, (1983), 460 U.S. 711, 75 L. Ed. 2d 403, 103 S. Ct. 1478]." HRC's order of Nov. 13, 1989, slip at 2.

The *Aikens* case involved a black employee who claimed he was denied promotion because of his race. After Aikens presented his case in district court, the postal service's witnesses testified Aikens was not promoted because he had declined several lateral transfers that would have broadened his experience. The Court held the district court then had sufficient evidence to decide the ultimate factual issue, whether the postal service intentionally discriminated against Aikens. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Aikens*, 460 U.S. at 715, 75 L. Ed. 2d at 410, 103 S. Ct. at 1482.

The HRC went on to discuss whether Clyde proved Caterpillar's articulated reasons for downgrading him were pretextual. The HRC relied on *Kindred v. Human Rights Comm'n* (1989), 180 Ill. App. 3d 766, 536 N.E.2d 447, to make its decision. The 52-year-old complainant in *Kindred* was terminated after 30 years' employment as a security guard at International Harvester. The termination occurred during a work force reduction in which 3,800 employees were laid off. Younger security employees were retained. The complainant alleged age discrimination and sought to prove he was more experienced and more qualified than several of the younger employees. The ALJ found complainant proved a *prima facie* case and International Harvester articulated legitimate, nondiscriminatory reasons for his discharge. Additionally, the ALJ found complainant failed to show direct evidence of age discrimination and failed to show International Harvester's reasons were pretexts for discrimination. The HRC affirmed the ALJ.

On appeal, Kindred argued the HRC placed an improper burden of proof on him, requiring him to prove his credentials were so superior that the reasons articulated by his employer were unworthy of

credence. (*Kindred*, 180 Ill. App. 3d at 768, 536 N.E.2d at 448.) The Third District Appellate Court disagreed, stating:

"In an age discrimination suit, the employee may prove his case with either direct or circumstantial evidence. (*McNeil v. Economics Laboratory, Inc.* (7th Cir. 1986), 800 F.2d 111.) In the indirect case, the employee must first prove a *prima facie* case of age discrimination. If the employer then articulates a lawful reason for the employee's dismissal, the employee has the burden of proving that the reason given by the employer is merely a pretext by showing that the discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence. [Citation.]

\*\*\* The petitioner's *prima facie* case was based on the circumstantial evidence that his credentials were superior to the credentials of several of the retained personnel. The respondent then articulated apparently legitimate reasons for its determination that the retained personnel had better credentials. At that point, the petitioner did not have to merely prove that his credentials were in fact superior. He had to prove that their superiority was so obvious that the respondent's reasoning was unbelievable and must be construed as merely a pretext for age discrimination. Accordingly, the Commission correctly paraphrased the \*\*\* burden of proof to fit the facts of the instant case." *Kindred*, 180 Ill. App. 3d at 768, 536 N.E.2d at 448-49.

The HRC in this case apparently believed Clyde's arguments were similar to those made by Kindred. "[I]t is not sufficient for the complainant to show that some of the incumbent management accountants were still considered probationary by the respondent. He must show, instead, that the reason articulated by the respondent is unworthy of credence." HRC's order of Nov. 13, 1989, slip at 4.

■ The HRC, following *Aikens*, could properly omit a discussion of the *prima facie* case and focus instead on pretext. Although the HRC's order and decision is brief, the evidence supports the decision to affirm the ALJ. Clyde failed to show Caterpillar's reasons for downgrading him were pretextual as Caterpillar articulated legitimate, nondiscriminatory reasons for downgrading him. "If the record contains any evidence supporting the administrative agency's decision, the decision must be sustained on review." *Bultas*, 171 Ill. App. 3d at 194, 524 N.E.2d at 1175.

Complainant asserts the HRC focused on two of his arguments in determining whether Caterpillar's articulated reasons for downgrading him were pretextual. The first argument focused on by the HRC

was whether Clyde was unfairly denied training in 1984 and the second was whether it was unfair to apply the "without-training" requirement against the two incumbent cost accountants, Weingart and Simms, who had probationary status only. Complainant contends the HRC erred when it examined these arguments against the burden set forth in *Kindred*, rather than against the legitimacy of the application of the "without-training" rule.

Complainant argues the HRC should not have made a distinction as to when a training rule can and cannot be used to discriminate between junior and senior employees. Specifically, complainant objects to Caterpillar's rule requiring an employee in a downgrade situation be able to perform a new job without training, and to the rule allowing new employees (recent hires) to be trained on the job. Clyde maintains Weingart should not have been considered an incumbent in the job classification because he had no seniority as compared to Clyde, and he was trained on the job. "Complainant questions the application of a training rule which denies him a job because he lacks the training but is not applied to younger employees who also lacked training but were given the same job."

Clyde's arguments are based on *Coates v. National Cash Register Co.* (W.D. Va. 1977), 433 F. Supp. 655. Coates was 50 years old and had 22 years' experience as a National Cash Register Co. (NCR) field engineer when discharged. His case was consolidated with a similar suit by Woodie Smith. Coates was trained on 15 mechanical machines but had not completed training to work on electromechanical or electronic machines. Many younger employees in the office had been requested by NCR to take training on electronic machines. Older employees rarely had opportunities to take training on the new equipment because they were busy servicing mechanical machines. Declining profits mandated discharge of employees. NCR discharged Coates and Smith because they were the only field engineers without training on electronic machines. The office manager "conceded that by using the training level as a criteria, he was forced to discharge the two oldest men in the office while keeping on one man who was not qualified to work on 85% of the machines in the *** area and another man who was only marginally qualified to service 85% of the machines." *Coates*, 433 F. Supp. at 659.

The *Coates* court concluded:

> "NCR's decision to discharge plaintiff was not directly based on age, but it was based on the training of plaintiffs. The evidence clearly established that the relative training levels of NCR employees was directly related to the age of the employ-

ees. So by using the training level as the basis of the discharge decision, NCR indirectly discharged plaintiffs because of their age. Therefore this court holds that the training or lack of training, which ostensibly is an objective and valid criterion for employment decisions, cannot form the basis of an employment decision when that lack of training is created by age discrimination. The age discrimination which invalidates an employment decision need not be direct or intentional. This court further holds that both plaintiffs were discharged 'because of' their 'age'." *Coates*, 433 F. Supp. at 661.

■ *Coates* is distinguishable on several grounds. First, the office manager in *Coates* testified if Coates and Smith had had training on electronic machines, they would not have been fired. Testimony in this case indicates that even if complainant had SAS training, he still could not have performed *any* of the cost-accounting positions without at least 1½ months' training. Second, the layoff procedure in *Coates* affected only the oldest employees. The "without-training" component of the downgrade procedure at Caterpillar was developed prior to the reorganization which necessitated the downgrade. The requirement adversely affected employees of all ages.

The HRC did not hold the complainant to an improper burden of proof as argued by complainant.

The next issue is whether the complainant established disparate treatment on the basis of age as it related to the SAS-training class. The ALJ concluded respondent's denial of SAS training for complainant was not based on his age. "Although Stanley did not use the SAS training on his job, this still does not support a finding that Respondent did not believe that Stanley did not need training on his current job. All that could possibly be inferred from this occurrence is a misjudgment by Respondent as to who should have taken SAS training." ALJ's recommended order of May 9, slip decision at 11.

Clyde argues there is no basis in fact to support the ALJ's inference of misjudgment. Schnake, the man sent to SAS training in Clyde's place, and Stanley were both under 40 years of age. "Complainant submits that the only inference from this evidence is that Respondent's reason for denying Complainant SAS training was based on age."

■ Disparate treatment requires a showing of intentional discrimination against the complainant. (*Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687-88.) The record fails to support Clyde's argument and does not reveal intentional discrimination on the basis of age by Caterpillar.

■ Complainant next argues he was qualified for the A-150 normals job in the cost-accounting division. The record indicates complainant was not qualified for the A-150 normals job, as discussed earlier. He lacked SAS and other training. He was a surplus management employee involved in a downgrade, not a new employee entitled to training on the job.

■ Complainant also argues the ALJ erroneously used testimony by Caterpillar's witnesses, that Clyde was not qualified for a cost-accounting position, in deciding he did not make a *prima facie* case. According to complainant, this testimony should not have been considered in the *prima facie* case determination, but in the next step of the *McDonnell Douglas* analysis, as Caterpillar's articulation of its reason for downgrading him. Complainant fails to recognize one element of the *prima facie* case: he had to show he was qualified for the normals job in 1985. He did not make such a showing.

■ The final issue is whether Caterpillar denied complainant the A-150 normals job because he could not perform it or because he was not qualified for it. Complainant argues because he was offered the A-150 normals job in 1982 and Pruski testified it was the same job in 1985 as in 1982, he was qualified for the job. This argument ignores testimony from Pruski that if Clyde had accepted the job in 1982, he would have undergone 1½ months' training and the offer of the job in 1982 was not an indication he was qualified for it. The distinction between "qualified" and "able to perform" is artificial.

Caterpillar's decision to downgrade the complainant was based on an established procedure for handling management employees during a reduction in work force, not on the complainant's age. The decision of the HRC is affirmed as complainant failed to show Caterpillar's reason for downgrading him was pretextual.

Affirmed.

SPITZ and McCULLOUGH, JJ., concur.