ILLINOIS J. LIVINGSTON COMPANY, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—97—2526

Opinion filed December 4, 1998.

Adducci, Dorf, Lehner, Mitchell & Blankenship, P.C., of Chicago (Randall L. Mitchell and Marshall L. Blankenship, of counsel), for petitioner.

Despres, Schwartz & Geoghegan, of Chicago (Leon M. Despres and Sarah Vanderwicken, of counsel), for respondent James J. Gisch.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Marcia L. McCormick, Assistant Attorney General, of counsel), for other respondents.

JUSTICE BURKE delivered the opinion of the court:

Petitioner Illinois J. Livingston Company (Livingston) appeals from an order of respondent Illinois Human Rights Commission (Commission) affirming the decision of an administrative law judge (ALJ) that it had unlawfully discriminated against respondent James Gisch on the basis of his age in violation of the Illinois Human Rights Act. 775 ILCS 5/1—101 *et seq.* (West 1992). On appeal, Livingston argues

that the decision of the Commission was against the manifest weight of the evidence, and the damages awarded Gisch were excessive because Gisch failed to properly mitigate his damages. For the reasons set forth below, we reverse.

On August 18, 1989, Livingston notified Gisch that his employment with Livingston would terminate on September 1, 1989. Subsequent to his termination, Gisch filed a charge of discrimination with respondent Illinois Department of Human Rights (Department) alleging that Livingston unlawfully terminated his employment on the basis of his age. The Department filed a complaint against Livingston, alleging age discrimination, and a three-day hearing was held before an administrative law judge.

The record discloses that Gisch had worked for Livingston for approximately seven years as an electrician in the Prudential Building, a large office building in downtown Chicago with space leased out to tenant companies, before Livingston terminated him. From 1982 to 1984, Gisch worked as a construction electrician, which Gisch described as mainly installing new equipment. From 1984 until his termination, Gisch worked as a maintenance electrician, which Gisch described as fixing equipment that needed repair. Prior to his employment by Livingston, Gisch worked for Prudential in the same building for 25 years as an electrician. Before that, Gisch had worked for Livingston in the same building for eight years. Accordingly, Gisch had worked for either Livingston or Prudential, in the same building, from 1949 until his termination in 1989.

Beginning in 1984, Prudential hired Rubloff & Company (Rubloff) to manage the Prudential Building. As a result, Rubloff gained control over the day-to-day operations of the building and control over what contractors serviced it. A contract between Livingston and Rubloff stated that Livingston was to provide electrical work for the building and that either party could terminate the agreement after giving 30 days' notice. At the time of Gisch's termination, Rubloff constituted approximately 60% of Livingston's business.

Livingston's foreman would receive requests for work in the Prudential Building and pass those assignments on to an electrician who would then go to the tenant space where the work was needed. The normal procedure was for the electrician assigned to check in with the tenant's office manager, proceed to do the necessary work, and then check out with the tenant's office manager. The electrician would fill out a work order and present it to the foreman, who would sign off on the work time and materials. This work order was eventually used to prepare invoices given to Rubloff, which would pass the costs on to the tenant. All the costs associated with Livingston em-

ployees, including benefits and vacation, were passed on to Rubloff, which in turn passed the costs on to the tenants.

At a hearing before an ALJ on his discrimination charge, Gisch presented evidence of his long career, hard work, and good reputation with other workers and tenants. Gisch testified that he received thank you cards from tenants and supervisors. Gisch had an excellent attendance record and was never late for work. Gisch also stated he never received complaints from his immediate supervisor, Paul Lussier, during his last two years with Livingston. According to Gisch, approximately one year before Livingston terminated him, Livingston required him to do extra paperwork on his jobs that no other electrician had to do, and Livingston changed a lock on the materials shed that he used to retrieve supplies. This necessitated Gisch tracking down the foreman and asking the foreman to open the shed since the foreman was the only one with the key. Gisch testified that he received complaints from his superintendent, Matthew Cashman, about his work approximately one year before he was terminated and knew that termination was a possible consequence if his work did not improve. Gisch further testified he did not perceive a problem because he was doing "the best *** [he] could."

Barton Sandvik testified on Gisch's behalf. Sandvik was employed by Livingston as a foreman from 1982 until he retired in 1984. Sandvik worked with Gisch for 27 years at the Prudential Building. Sandvik stated that, in his opinion, Gisch was an excellent electrician. Sandvik further stated that he never had to redo Gisch's work, and "[t]here's nothing that you would expect an electrician to do that he can't do or won't do." Sandvik had never received complaints about Gisch's work during the last two years Sandvik worked for Livingston. According to Sandvik, there were no written standards describing how long certain jobs should take, and the time estimates were all based on the foreman's experience. On cross-examination, Sandvik stated that although there were no written time estimates, over time it became clearer how long some jobs should take. Sandvik acknowledged the need to keep tenants happy and to accommodate tenants. Sandvik could not recall exactly when Rubloff took over control of the Prudential Building, but estimated he only worked under Rubloff management for one or two months.

Robert Marsh, who was the chief engineer in the Prudential Building until his retirement in 1989, testified that he was a stationary engineer with responsibility for temperature control, he was an employee of Rubloff at the time of his retirement, and he had worked with Gisch on and off from 1955 until Gisch's termination. According to Marsh, Gisch's work was very dependable and he never had any

complaints. On cross-examination, Marsh admitted he was not an electrician, he had responsibilities for many areas other than electrical areas, he did not have an opportunity to observe Gisch's work in tenant spaces, and Gisch's foremen would probably be in a better position to evaluate Gisch's work performance.

Leo Forque, another stationary engineer in the Prudential Building, testified he "had all the confidence in the world in [Gisch] and [Forque] knew if [Gisch] was given the job, the job would have been done right." Forque never had to have any of Gisch's work redone and Forque never had a problem with the timeliness of Gisch's productivity. On cross-examination, Forque stated he was not an electrician, and it was not his job to evaluate Gisch's work.

In its case in chief, Livingston called its vice president, Robert Rathman, as a witness. Rathman testified that electricians working for Livingston worked under one of two union agreements. Under this scheme, Gisch was the least expensive electrician in the Prudential Building and as such could be seen as an asset to the company, allowing it to lower its prices to tenants. Rathman stated that Livingston's ability to work in the Prudential Building was completely based upon an agreement with Rubloff, and Rubloff or Livingston could terminate the agreement by giving a 30-day notice to the other party. At the time of Gisch's termination, the Prudential Building work constituted approximately 60% of Livingston's work volume. Rathman further stated that shortly after Rubloff took over control of the building in 1984, he had occasion to speak with Rubloff's operations manager, Bill McElligott, who complained about the length of time a job assigned to Gisch was taking. Approximately one year prior to Gisch's termination, Rathman had lunch with McElligott and Barbara DeLeon, who was the office manager for the building's largest tenant, Leo Burnett. At that time, DeLeon complained to Rathman about Gisch's work performance.

Rathman also stated he received a call from John Dwyer, another employee of Leo Burnett, shortly before Gisch was terminated. Dwyer also complained about Gisch's work. Rathman further testified that he had general conversations on a regular basis with Gisch's immediate supervisors on their perceived problems with Gisch's work performance. Rathman would pass complaints from Rubloff on to Gisch's direct superiors and instruct them to speak with Gisch about the problems.

Rathman further stated that in May 1989, he ordered Matthew Cashman, Gisch's superintendent, to give Gisch a layoff notice. Cashman delivered the notice to Gisch, but Gisch was never laid off. After Rathman gave the notice to Gisch, he received a call from the

Prudential Building's manager, who apparently persuaded Rathman to allow Gisch to continue working. Thereafter, Gisch was mainly given jobs that required no tenant interaction, including at least two complex tasks Gisch worked on prior to his termination which he was assigned to because those tasks did not involve his being in client spaces.

On August 16, 1989, Rathman received a letter dated August 14, 1989, from Thomas Ponicki, who was then Rubloff's director of operations, complaining about Gisch's work and indicating that Grant Thornton, another large Prudential Building tenant, no longer wanted Gisch working in its space. According to Rathman, the Ponicki letter was "basically the final straw" in Livingston's decision to terminate Gisch. It was at this time that Rathman instructed Cashman to terminate Gisch.

Rathman also stated that he believed he had to either put up with Gisch in the Prudential Building or terminate him, and, under the union agreements, he could not move Gisch to a different building Livingston worked in. On cross-examination, Rathman stated he never took notes of meetings about Gisch or memorialized the meetings in any way. Most of the meetings were informal affairs over lunch or the phone.

Barbara DeLeon testified that at the time of Gisch's termination, she was Leo Burnett's facility's manager and responsible for setting up office space for new employees or employees "moving around." DeLeon would contact Rubloff if she needed work done, and Rubloff would then contact Livingston. DeLeon further stated she would "lay out" for the workers exactly what needed to be done, with floor plans and directions which she gave to the workers. DeLeon related a problem that arose when Gisch took two or three days for a series of jobs that were estimated to take no more than six to eight hours. DeLeon complained about the time it was taking to complete the job and one of Gisch's supervisors came to finish the job, taking only a few hours. Another incident, causing DeLeon to complain, arose when Gisch was to core a hole to run some new wire in Leo Burnett's space to hook up an airline ticket machine. DeLeon stated that Gisch cored the hole in the wrong location and then had to fix the error, and then do the job over. DeLeon then asked Bob Sivotka, another Livingston worker, to take over and finish the job for Gisch.

DeLeon also stated that she observed Gisch being slow in his work, talking to tenants a lot, not informing her when he was unable to complete a job, and just leaving the work site without telling anyone that he was leaving. Gisch's slowness was a concern to DeLeon because she had to get other workers into the work space, and Leo Burnett

would be billed for Gisch's slow work. Eventually DeLeon asked several people not to send Gisch to work in Leo Burnett's space.

John Holthaus, Grant Thornton's director of administration in 1989, testified he was responsible for the internal operations of the office, including the maintenance and upkeep of the office. Holthaus stated that the normal procedure for Livingston electricians when working in Grant Thornton's space was for them to report to him upon their arrival and departure so that Holthaus would know when to request other workmen. Gisch failed to report his leaving on several occasions. On one particular occasion in the summer of 1989, Gisch was sent up to work on computer terminals, which the company needed working right away. According to Holthaus, Gisch left work at 3 p.m. without finishing the job and left the terminal inoperable. Gisch's failure to finish the project caused inconvenience to Grant Thornton and caused it to miss some deadlines. A second instance occurred when some "major re-wiring" was needed for a computer system. Livingston estimated the job would take "a day maybe a day and a half." After three days, Gisch had not completed the job, and Livingston sent another electrician to finish the job in one-half a day. Holthaus complained to the building office and McElligott and was assured Gisch would not be sent to Grant Thornton's space unless no other electricians were available.

Holthaus further testified that, after the second incident, he made it clear to Rubloff that he did not want Gisch in the space "no matter what." According to Holthaus, as a result of Gisch's failure to timely complete tasks, Grant Thornton suffered an indeterminable monetary loss and unnecessary disruption of the office. Holthaus also stated he recalled times when Gisch would leave a work area at 3 p.m. and leave wires dangling out of a ceiling or pulled out of a floor.

William McElligott, the Prudential Building's chief engineer, testified he had been at the Prudential Building since Rubloff took it over in 1984. At the time of Gisch's termination, McElligott was operations manager and responsible for most of the maintenance and construction work in the building, including electrical. McElligott was employed by Rubloff to oversee the contractors at the building. McElligott stated that at no time did he ever receive a complaint about the quality of Gisch's work, but he did receive complaints from tenants, particularly Leo Burnett and Grant Thornton, about how long it took Gisch to complete tasks. McElligott took these complaints seriously because it was his job to ensure the tenants were satisfied. On several occasions McElligott spoke with Bob Rathman about complaints McElligott received about Gisch. McElligott recalled that the first complaints about Gisch occurred in late 1985 or early 1986. Tenants

would complain about the cost of the work being done and that they did not feel the invoices Rubloff sent them reflected the amount of work actually done for the time billed.

McElligott further stated that, occasionally, because of tenant complaints, either Rubloff would absorb some of the extra cost or would refuse to pay the high bill and require Livingston to absorb it. Due to complaints about Gisch, Leo Burnett asked that Gisch not be sent to its space any longer. McElligott also stated that he was aware that Livingston terminated Gisch and believed it was due to the tenant complaints and the fact that the demand for electricians was down. On cross-examination, McElligott attributed the reduction in tenant-occupied space, by roughly 50%, as having contributed to Gisch's termination.

Paul Lussier, a foreman for Livingston and Gisch's former supervisor, testified that in August 1984 he began working as a journeyman at the Prudential Building. In August 1986, Lussier became a foreman in the Prudential Building and was responsible for electrical installations. He supervised between four to six electricians, including Gisch. He was also responsible for estimating the time needed for jobs in client spaces before assigning an electrician to the job. Lussier had occasion between 1986 to 1989 to counsel Gisch on deficiencies in Gisch's work. Specifically, Lussier had a problem with how long it took Gisch to perform jobs. On one occasion in 1987, DeLeon needed an electrician for some work in Leo Burnett's space and specifically requested that Lussier not send Gisch.

In August 1988, Lussier again counselled Gisch after receiving a complaint from John Dwyer, an employee of Leo Burnett. Dwyer complained that the installation of a pop machine, that Lussier himself had estimated to be an 8- to 13-hour job, was not progressing. Lussier had begun the work earlier in the day and was familiar with what needed to be done. The job ended up taking Gisch 23 hours to complete. Lussier related this incident to his superiors, and eventually Lussier went with Cashman, Livingston's superintendent and project manager, and other Livingston supervisors to review the work. This complaint caused Cashman to issue a memorandum to Gisch which Lussier had discussed with Cashman. The memorandum indicated that Cashman and Lussier had a series of conversations about Gisch's performance in the past and that if Gisch's productivity didn't improve, "appropriate action" would be taken. The memorandum also indicated that Gisch's performance would be monitored. Lussier further testified that he was instructed by Cashman to monitor Gisch, failed to see any improvement in Gisch's work, and he again counselled Gisch in April 1989 after another complaint. As a result of this com-

plaint, Holthaus requested that Gisch not be sent to Grant Thornton's space any longer.

In addition to Grant Thornton, Lussier received requests from Leo Burnett not to send Gisch to its space. Lussier commented that in 1987 he had a conversation with McElligott, who stated his displeasure with Gisch's performance and that, if it continued, Rubloff might not allow Livingston workers in some tenant areas any longer.

In 1988, Lussier became aware of the extra paperwork Cashman required Gisch to fill out. The extra paperwork was needed because the work orders were vague, and the tenant complaints against Gisch required some justification for Gisch's work. According to Lussier, it took Gisch approximately three to five minutes per day to fill out this extra paperwork, and that time was billed so Gisch was paid for this time. In approximately April 1989, Lussier went to Cashman because Gisch was not responding to Lussier's attempts to improve Gisch's work performance.

Thomas Cutrara, a general foreman for Livingston, testified that he had known Gisch for 23 years and had been a general foreman for Livingston at the Prudential Building since 1981. Cutrara took responsibility for maintenance electricians, including Gisch, sometime in 1989. Cutrara identified several Livingston work orders for similar jobs, replacing a broken light switch, done by three different electricians. Two of those electricians did the job in one-half hour. It took Gisch twice that amount of time to complete the job. Cutrara identified another set of work orders in which two electricians did similar jobs. One electrician did the job in two hours, whereas it took Gisch eight hours. Cutrara admitted that there was approximately one hour of extra work in Gisch's assignment, but even allowing for that extra hour, the job should have taken Gisch approximately three hours.

Throughout 1989, Cutrara made personal observations that Gisch's work was not done in a timely fashion. Cutrara had occasion to speak to both Cashman and Rathman concerning Gisch's slow work. During 1989 when Cutrara was Gisch's supervisor, he never observed any improvement in Gisch's speed. In May 1989, Cutrara personally delivered a layoff notice to Gisch. According to Cutrara, after the layoff notice, and Livingston's subsequent decision not to lay Gisch off, the jobs Gisch was given were ones that did not require him to come into contact with tenants. Cutrara also stated that he agreed with the decision to terminate Gisch because Livingston could no longer place Gisch in tenant space.

Matthew Cashman, Livingston's project manager and superintendent, testified that during the time Gisch worked for Livingston, Cashman was responsible for the hiring and termination of manpower, as

well as general oversight of the work area. Cashman had approximately 30 years' experience as an electrician and had seen the efficiency of electricians increase greatly over that time period. According to Cashman, Gisch failed to adapt to the changes in the industry and failed to become more efficient. Cashman further stated that when Rubloff took over the Prudential Building's management in 1984, it had different expectations about efficiency and the time it took to do certain jobs than what Livingston was used to prior to that time. Cashman received complaints from Rathman and Gisch's foremen periodically between 1984 and 1989 about Gisch's work. Prior to 1988, Cashman had personally discussed Gisch's work performance with him approximately six times. Whenever Cashman would speak to Gisch about productivity problems, Gisch would simply respond that he was doing the best he could. The only complaint supervisors and tenants had about Gisch's work was the time it took him to complete jobs. Cashman personally reviewed a job Gisch had done installing coffee makers and a pop dispenser in a tenant's space in 1988 and determined, along with other Livingston supervisors, that Gisch took substantially too much time in completing the job.

Cashman also stated that he had Gisch fill out extra paperwork because he had received so many complaints about the time it took Gisch to complete tasks that the extra paperwork would give Gisch an opportunity to document exactly what he had done and what problems he encountered. Cashman maintained that the paperwork was to protect Gisch against the complaints. In May 1989, Cashman and Rathman decided that there were too many complaints and that Gisch had to be terminated. As a result, Cashman had Cutrara give Gisch a layoff notice. However, the next day, Rathman called Cashman to relate an agreement between Livingston and Prudential supervisor Bob DeMarc that Prudential would supply enough jobs for Gisch. These jobs would not require Gisch to work in tenant areas or on Rubloff jobs.

As a result of the agreement, Gisch continued to work after his May 1989 layoff notice until his termination in August. The events leading up to his termination involved a job in Grant Thornton's space. After receiving complaints, Cashman and Rathman decided they needed to terminate Gisch. Cashman was able to identify the names of several Livingston employees who worked while in their sixties and until they decided to retire.

Cashman admitted on cross-examination that no other employees were terminated the year prior to Gisch's termination for lack of productivity, only for absenteeism. Although Cashman testified he had approximately six discussions with Gisch about his productivity, he could

not recall the exact dates of those conversations other than one that occurred in early 1984. Cashman never kept a log of discussions, nor apprised Rathman in writing of his conversations with Gisch.

Cashman further stated that although Gisch was not insubordinate, Gisch would not change his attitude and methods to meet the demands of Livingston's customers. While Cashman looked at Gisch's termination as an option as early as 1988, Livingston fought with Rubloff to keep Gisch on and attempted to convince Rubloff and tenants that the work Gisch did was justified. Cashman also acknowledged that Livingston occasionally absorbed some of Gisch's excess costs in order to keep Rubloff happy and allow Gisch to continue working.

In rebuttal, Gisch testified that he never left dangerous situations in tenant spaces, and if he ever had to leave work unfinished at the end of the day, he would cover it, place barricades around it, bundle any loose wires, and always replace tools in his truck. Gisch maintained that he never really stopped working in tenant space, specifically Leo Burnett's, from 1984 until he was terminated. Gisch further stated that he never left a tenant space without speaking to the person in charge of the space, and specifically never worked three consecutive days in Grant Thornton's space, as contended by Livingston and Holthaus.

The ALJ subsequently found that Livingston had unlawfully discriminated against Gisch on the basis of age and awarded Gisch over $130,000 in damages. In a split decision, the Commission affirmed and adopted the ALJ's decision. This appeal followed.

■ When reviewing a decision of an administrative agency, all findings of fact of the agency are deemed *prima facie* true and correct, and those findings "should be sustained unless the court determines that such findings are against the manifest weight of the evidence." *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479, 672 N.E.2d 1136 (1996), citing *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180, 545 N.E.2d 684 (1989); 735 ILCS 5/3—110 (West 1996).

■ The Illinois Human Rights Act (Act) (775 ILCS 5/1—101 *et seq.* (West 1992)) guarantees freedom from discrimination in employment. Section 1—103 of the Act defines unlawful discrimination as "discrimination against a person because of his or her race, color, religion, national origin, ancestry, [or] age." 775 ILCS 5/1—103(Q) (West 1996). Pursuant to the Act, persons over 40 years of age are included in the protected class. 735 ILCS 5/1—103(A) (West 1992).

Here, Livingston argues Gisch failed to present any direct evidence of age discrimination by Livingston. As stated in *Interstate Material Corp. v. Human Rights Comm'n*, 274 Ill. App. 3d 1014, 1021,

654 N.E.2d 713 (1995), "[e]mployment discrimination actions brought under the Illinois Human Rights Act are to be analyzed in accordance with the framework set forth by the United States Supreme Court decisions reviewing claims brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* (1982)) and the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.* (1982))." The fact that a party cannot present direct evidence of unlawful age discrimination, *i.e.*, evidence that an employer made specific comments about an employee's age before terminating the employee, does not defeat his claim (*Clyde v. Human Rights Comm'n*, 206 Ill. App. 3d 283, 294, 564 N.E.2d 265 (1990)); "[i]n an age discrimination suit, the employee may prove his case with either direct or circumstantial evidence" (*Kindred v. Human Rights Comm'n*, 180 Ill. App. 3d 766, 768, 536 N.E.2d 447 (1989)).

■ *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), which our supreme court adopted in *Zaderaka* (131 Ill. 2d at 178), set out a three-step approach in proving a case of unlawful discrimination with indirect evidence of discrimination, *i.e.*, evidence that the employer's actions, although not overtly discriminatory, were designed to unlawfully discriminate (see generally *Kindred*, 180 Ill. App. 3d at 768 (stating that an employee must "prove that [his qualifications were so superior and] so obvious that [the employer's] reasoning was unbelievable and must be construed as merely a pretext for age discrimination")). First, a plaintiff must establish by a preponderance of the evidence a *prima facie* case of discrimination. If a *prima facie* case is established, the burden shifts to the defendant, who must rebut the *prima facie* case by articulating, not proving, a valid nondiscriminatory reason for the action. Once the defendant articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the proffered nondiscriminatory reason was a pretext for unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 179. However, "the inquiry cannot end merely because the employee has succeeded in discrediting the employer's proffered reasons; the employee must present sufficient evidence to permit a finding that the employer's proffered reasons masked *intentional* *** discrimination rather than some legitimate, though not necessarily commendable, motive." (Emphasis added.) *Christ Hospital & Medical Center v. Human Rights Comm'n*, 239 Ill. App. 3d 105, 111, 687 N.E.2d 1090 (1997). At all times the ultimate burden of proof remains with the plaintiff. *Zaderaka*, 131 Ill. 2d at 179.

■ A *prima facie* case of unlawful age discrimination is established by showing by a preponderance of the evidence that: "(1) the complain-

ant is a member of a protected class (age 40 or over), (2) he was doing the job well enough to meet his employer's legitimate expectations, (3) he was discharged or demoted, and (4) the employer sought a replacement for him." *Roedl v. Midco International*, 296 Ill. App. 3d 213, 217, 694 N.E.2d 179 (1998).

■ In the present case, Gisch, aged 61 at the time of his termination, demonstrated that he was a member of the protected class. The ALJ found, and there is some evidence in the record sufficient to establish a *prima facie* case, that Gisch met Livingston's performance standards. Specifically, the ALJ found the testimony of Gisch's coworkers credible that Gisch's work was of the highest quality, and Gisch was terminated notwithstanding his performance. The ALJ further found, contrary to Livingston's argument, that Livingston sought a replacement for Gisch by initially rotating the manpower in the building rather than hiring a new employee. Based on the evidence, we cannot say the ALJ's finding that Gisch established a *prima facie* case of age discrimination was against the manifest weight of the evidence.

Since Gisch established a *prima facie* case, a rebuttable presumption arose in favor of Gisch that Livingston had discriminated against him. The burden then shifted to Livingston to articulate, not prove, a valid nondiscriminatory reason for Gisch's termination. Livingston's witnesses' testimony that Gisch worked too slowly and that Livingston received complaints about Gisch from clients was a valid nondiscriminatory reason for terminating Gisch. As a result of Livingston having articulated a valid nondiscriminatory reason, Gisch was required to prove that Livingston's proffered reason for termination was a pretext and that Livingston, in fact, discriminated against him because of his age.

The ALJ found Livingston's proffered reason not worthy of belief and was "pretextual" based on the following: according to the ALJ, Gisch's witnesses were more credible than Livingston's witnesses; the ALJ placed significant emphasis on the fact that Livingston continued to employ Gisch after receiving complaints against him and assigned him to two complex tasks immediately prior to terminating him; and the proffered reason Livingston gave for Gisch's termination was contradicted by McElligott, an employee of Rubloff, who testified he believed the fact that Leo Burnett had moved out of the building lowered the need for electricians and was a factor in Gisch's termination.

■ We disagree with the ALJ's apparent determination that once it found Livingston's proffered reason pretextual, a finding of unlawful discrimination necessarily follows. As the United States Supreme Court stated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515-

17, 125 L. Ed. 2d 407, 421-22, 113 S. Ct. 2742, 2751-52 (1993), once an employer proffers a nondiscriminatory reason, " 'the factual inquiry proceeds to a new level of specificity.' " *Hicks*, 509 U.S. at 516, 125 L. Ed. 2d at 422, 113 S. Ct. at 2752, quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 67 L. Ed. 2d 207, 216, 101 S. Ct. 1089, 1095 (1981). The " 'new level of specificity' *** refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a *prima facie* case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *Hicks*, 509 U.S. at 516, 125 L. Ed. 2d at 422, 113 S. Ct. at 2752. The *Hicks* Court specifically rejected the argument that once an employee shows the employer's proffered reason false, the employee is entitled to judgment. *Hicks*, 509 U.S. at 515-16, 125 L. Ed. 2d at 421-22, 113 S. Ct. at 2751-52. Instead, while an employee may prove unlawful discrimination by establishing a *prima facie* case and showing that an employer's proffered reason is not true without any additional proofs, a final determination of unlawful discrimination, however, must be established by, and supported with, a factual finding. See *Hicks*, 509 U.S. at 511-12 n.4, 125 L. Ed. 2d at 418-19 n.4, 113 S. Ct. at 2749 n.4.

This court recently decided a case similar to the present case, where the petitioner employee, who was black, was denied a promotion and claimed that his employer's decision was based upon his race. *Christ Hospital*, 293 Ill. App. 3d at 105. In *Christ Hospital*, the evidence presented at the hearing disclosed that the employee worked at Christ Hospital for approximately four years before he was denied the promotion to the position of quality control officer. During this time, the employee, along with others, came under investigation for irregularities in the department. The employee acknowledged responsibility in a scheme to gain excess travel expenses and made restitution to the hospital. Also during this period, the employee's supervisor gave him a poor performance evaluation and recommended that the employee be terminated based upon his involvement in the events under investigation. The hospital's associate administrator rejected the recommendation to terminate the employee and, later, after the employee had been cleared of further wrongdoing in the investigation, the associate administrator changed the poor performance evaluation and the employee received a pay increase and full retroactive pay.

In 1984, the hospital undertook to reorganize its departments, including the elimination of the employee's employment classification and the addition of a new job classification of "quality control officer." The hospital posted the opening for the new position according to its policy of "bidding" and hiring from within. The employee put in his bid and was the sole applicant, but the hospital denied the employee

the position, stating he did not possess sufficient knowledge and experience regarding toxic cleaning substances even though hospital officials admitted that he had been working with the same material and training the cleaning staff about the use of the materials. Additionally, according to the associate administrator, the new quality control position had substantially the same duties as the employee's old position. The new position remained open until August 1984, when the hospital withdrew it, and in October 1984, the hospital created a "quality control training coordinator position," which the employee never applied for because he claimed it was never posted. Subsequently, the position was awarded to a white woman who was subordinate to the petitioner employee.

The ALJ found, and the Commission affirmed, that the hospital had discriminated against the employee. In reversing the Commission, this court, while acknowledging that the evidence supported the Commission's finding that the hospital's proffered reasons were pretextual, found that "a finding that the employer's proffered reasons were pretextual does not automatically compel judgment for the employee. Rather, the burden rests with the employee to prove that the reasons were pretexts *for racial discrimination*." (Emphasis added.) *Christ Hospital*, 293 Ill. App. 3d at 111. The "employee must present sufficient evidence to permit a finding that the employer's proffered reasons masked *intentional* *** discrimination rather than some other legitimate, though not necessarily commendable, motive." (Emphasis added.) *Christ Hospital*, 293 Ill. App. 3d at 111. The *Christ Hospital* court noted that "the Commission painstakingly recounts the inconsistencies in [the hospital witnesses'] testimony, discrediting the hospital's proffered reasons," and "after finding that the hospital's reasons *** were pretextual, the Commission, without further findings of fact, concluded that the hospital discriminated against [the employee] on the basis of race." *Christ Hospital*, 293 Ill. App. 3d at 111-12. The court further noted that, even though the hospital had a strong policy of promoting from within and the petitioner had the requisite knowledge for the job and was the sole applicant, these points "simply prove[d] that the hospital did not desire to give [the petitioner] the promotion," and "[t]hese facts, standing alone, do not support an inference of racial discrimination." *Christ Hospital*, 293 Ill. App. 3d at 112. The court concluded that arguably an inference of racial discrimination could be based on whether the employer rewrote the quality control position as " 'quality control training coordinator,' and then, without posting it, award[ed] the new position to a less-qualified white woman." *Christ Hospital*, 293 Ill. App. 3d at 112. However, because the Commission failed to make any factual finding on the

question of whether the quality control training coordinator position had been properly posted to be bid upon by employees, the court reversed for a determination by the Commission and for the taking of further evidence in order to resolve the issue of whether the hospital discriminated against the petitioner on the basis of race in denying him a promotion to the quality control position. *Christ Hospital*, 293 Ill. App. 3d at 112-13.

■ We believe *Christ Hospital* is directly on point to the facts of the present case.[1] Here, the evidence relied on by the ALJ and Commission, in finding unlawful discrimination, can be reduced to the following: (1) the testimony of Gisch and his former coworkers that he did his job well was more credible than Livingston's that his work was slow; (2) Livingston's failure to terminate Gisch more promptly and assigning Gisch two complicated tasks discredited Livingston's argument that Gisch's performance was inadequate; and (3) Livingston's proffered reason for termination was discredited by the testimony of Rubloff's agent that a reduction in work was the true reason for termination. However, no evidence was presented that McElligott was privy to the decision-making process of Livingston, or that he had some special relationship in the decision to terminate Gisch that would have allowed him to have personal knowledge of such a fact. In fact, McElligott did not even testify that he was told by anyone at Livingston that Gisch was actually fired because of a reduction in the demand for electricians; rather, he stated only that it was his belief that Gisch was fired because of a reduction in the need for electricians. We further observe that McElligott also testified that he had received complaints about Gisch's work from tenants. The Commission made no factual findings pointing to any discriminatory intent. It is clear that the ALJ relied on its determination that Livingston's reason for terminating Gisch was false. Moreover, the alternate reason brought out by Gisch, *i.e.*, McElligott's belief that Livingston needed to reduce its work force, is, in and of itself, not discriminatory. See generally *Kalush v. Department of Human Rights Chief Legal Counsel*, 298 Ill.

---

[1]Plaintiff argues that *Christ Hospital* is distinguishable from the present case because the petitioner in *Christ Hospital* failed to prove a *prima facie* case. However, no issue was presented in *Christ Hospital* of whether the petitioner failed to present a *prima facie* case and, in any event, it is irrelevant whether he did so. *Clyde*, 206 Ill. App. 3d at 293, quoting *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 75 L. Ed. 2d 403, 410, 103 S. Ct. 1478, 1482 (1983) (where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant).

App. 3d 980, 996, 700 N.E.2d 132 (1998), citing *Hazen Paper Co. v. Biggens*, 507 U.S. 604, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993) (holding "a desire to save salary expense would not in and of itself provide sufficient evidence of age discrimination").

There also was no evidence that Livingston took deliberate intentional steps to discharge or otherwise discriminate against Gisch or other employees within the protected age group (disparate treatment). See *Clyde*, 206 Ill. App. 3d 283, 564 N.E.2d 265. To the contrary, it was uncontradicted that "[o]f the 76 electricians employed by *** [Livingston] at the Prudential Building between September, 1988 and September, 1989, 43 (56%) were over age 40 and 10 (13%) were over the age of 60." In addition, there was testimony that at least six employees who had retired from Livingston were over the age of 60 and had worked for Livingston for many years. Gisch presented no evidence that Livingston had, in the past, discharged older workers in any greater proportion than younger workers. Even if Livingston's proffered reasons for discharging Gisch, poor performance and tenant complaints, were pretextual, which the ALJ as the trier of fact could reasonably conclude, and even if Livingston possibly did not have commendable motives, such reasons and motives do not establish an unlawful discriminatory intent. Moreover, even Gisch admitted that he believed that Livingston believed that he should be fired because of complaints from Rubloff. Gisch also admitted that he had received warnings from his superiors. Additionally, Livingston, after consulting with Prudential, withdrew a May 1989 layoff notice directed to Gisch and continued to employ him until it terminated him on September 1, 1989. Like the circumstances in *Christ Hospital*, these facts, without any showing of intentional discrimination, lead only to the conclusion that Livingston had decided that it could no longer continue to employ Gisch based on accumulated reports of his poor performance and, as Gisch admitted, the existence of tenant complaints regarding his performance. See *Christ Hospital*, 293 Ill. App. 3d at 111.

Gisch simply presented no evidence to demonstrate that Livingston's motives in terminating his employment were based on unlawful age discrimination. In fact, throughout the course of oral argument, this court gave all respondents numerous opportunities to point to specific facts in the record to demonstrate a discriminatory intent. Respondents could not relate any facts other than Gisch was 61 when he was terminated and that the ALJ found Livingston's articulated reason unbelievable. We believe that simply because the ALJ and Commission disbelieved Livingston's proffered reasons for terminating Gisch and the fact that Gisch was 61 are not sufficient to satisfy the requirement of *Hicks* that once a respondent proffers a valid

nondiscriminatory reason, the hearing moves into a " 'new level of specificity' *** [that] refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a *prima facie* case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced," with the burden of proof on the petitioner. *Hicks*, 509 U.S. at 516, 125 L. Ed. 2d at 422, 113 S. Ct. at 2752. We fail to see how, without other specific facts demonstrating an unlawful discriminatory intent on Livingston's part, the only alternative motivation Gisch did show for his termination, *i.e.*, a need to reduce the work force because of a 50% decline in tenants, and the mere disbelief of Livingston's proffered reasons, demonstrated any discriminatory intent.

We further briefly observe that a ruling such as the one the Commission urges on the facts of this case would dramatically alter the relationship between employers and employees. The practical effect would be to transform employment terminable at will, where an employer may terminate any employee for a good reason, a bad reason, or no reason at all, to a situation where once an employee reaches the age of 40, his employment is suddenly transformed into employment terminable only for cause. Under the formula advanced by the Commission, an employer who terminated a 60-year-old employee simply on a whim, or a reduction in the work force as alleged here, could very likely be found to have discriminated against the employee because whatever reason the employer advanced was not believed to be the real reason by an ALJ. However, even though an employee can make a *prima facie* case of discrimination, the ultimate burden is on him to show discriminatory intent underlying an employer's motive in terminating the employee based upon specific facts. *Christ Hospital*, 293 Ill. App. 3d at 111. Because the ALJ made no factual findings supporting a discriminatory intent other than its disbelief of Livingston's proffered reason, we hold that the decision of the Commission, affirming the ALJ's finding that Livingston unlawfully discriminated against Gisch based on his age, was against the manifest weight of the evidence. In light of our holding, we need not address Livingston's remaining argument regarding the damages awarded to Gisch.

For the reasons stated, the order of the Commission is reversed.

Reversed.

GORDON and LEAVITT, JJ., concur.