DONA J. MARINELLI, Petitioner-Appellant, v. THE HUMAN RIGHTS
COMMISSION *et al.*, Respondents-Appellees.

Second District    No. 2—93—0551

Opinion filed May 19, 1994.

Ellen B. Lynch, of Havrilesko & Associates, of Rockford, for petitioner.

Roland W. Burris, Attorney General, of Chicago (John A. Morrissey, Assistant Attorney General, of counsel), for respondents Human Rights Commission and Department of Human Rights.

Thomas H. Riley, Jr., James R. Pirages, and Samuel J. Castree, Jr., all of Hinshaw & Culbertson, of Rockford, for respondent St. Anthony Medical Center.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Dona J. Marinelli, appeals from the Illinois Human Rights Commission's (Commission's) denial of a petition for rehearing after the Commission ordered the dismissal of petitioner's charge of age discrimination against St. Anthony Medical Center (St. Anthony). Petitioner raises two issues for review: whether the Commission applied an erroneous standard when it dismissed the charge of discrimination; and whether the Commission's decision was an abuse of discretion.

■ Before summarizing the facts, we first address respondents' motion to strike petitioner's brief. We ordered that the motion be taken with the case. According to respondents, petitioner's brief contains inaccurate statements of fact and statements of fact accompanied by argument and comment. Supreme Court Rule 341(e)(6) provides that the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." (145 Ill. 2d R. 341(e)(6).) Before respondents filed their motion to strike, petitioner had moved to supplement the record on appeal with documents and correspondence which were omitted from the record. We allowed petitioner's motion, and the facts to which respondents object are based on these documents. Thus, petitioner's factual averments are not in violation of Rule 341(e)(6). As for respondents' objection that the statement of facts is argumentative, we deny the motion to strike because the argumentative statements are not so flagrant as to hinder our review. See *Cottrill v. Russell* (1993), 253 Ill. App. 3d 934, 938.

On December 9, 1991, petitioner filed a charge of discrimination against St. Anthony with the Illinois Department of Human Rights (Department). Petitioner alleged that she was 58 years old and had worked as a trauma registry clerk/secretary for 12 years for St. Anthony, then as a data entry clerk/secretary. In the fall of 1990 she became a trauma registry clerk until St. Anthony discharged her. In March 1991, St. Anthony hired a new director of the trauma services department; in July 1991, he gave petitioner a poor performance evaluation; and on August 9, 1991, he told petitioner she was terminated effective September 9, unless she could find another position with St. Anthony, but in another department. Petitioner was not hired for any position for which she applied at St. Anthony. Petitioner believed she was discriminated against on the basis of her age because she was the oldest person in the department, everyone else being in their 20s or 30s; petitioner's prior evaluations were excellent or above average; St. Anthony refused to train petitioner

on a new computer, although she made numerous requests; and St. Anthony "scolded [petitioner] for conduct which [she] did not engage in and which younger employees did, without a reprimand."

On September 2, 1992, the Department filed the investigation report (report), recommending a finding of "lack of substantial evidence." According to the report, petitioner stated that she was a trauma registry clerk at St. Anthony from 1974 until 1989, when she became a data entry clerk. In the fall of 1990, the medical director recommended that petitioner become a trauma registry clerk. In March 1991, Gerry Jenich was hired as director of the trauma services department. Prior to his appointment, petitioner's performance was acceptable, but in July 1991, Jenich singled out petitioner and gave her a poor performance evaluation. Jenich asserted that petitioner had problems communicating and was receiving many personal telephone calls. Petitioner stated this was untrue, and she explained that all of her calls were work-related. In addition, she stated that no one ever "talked to her about errors that she made or excessive telephone calls that she received," nor had she received written warnings. According to petitioner, Holly Huffman, a secretary, received as many personal telephone calls as petitioner, but she was not disciplined. In addition, petitioner was supposed to receive training on the computer, which she did not receive. Huffman had problems using the computer, but St. Anthony did not discipline her.

Roy Leslie stated that petitioner was his secretary between 1976 and 1989 and her performance was excellent. Leslie moved from his office at St. Anthony to the State of Illinois building in 1989, after which he did not know what petitioner's duties were or how she performed.

Mark Thate, the human resources director for St. Anthony, stated that when Leslie moved to the State of Illinois building, petitioner's position was eliminated. She became a clerk in the quality assurance department in February 1989, but that position was eliminated on September 30, 1990, in a reduction in force. Petitioner was then transferred back to the position of clerk, with responsibility for trauma registry. After petitioner was terminated, her duties were absorbed by others.

Sue Taphorn, the director of quality assurance and risk management, stated that petitioner made numerous typing mistakes while working in the quality assurance department. Petitioner also had problems using the computer to log in incident reports. Petitioner was not happy in the quality assurance department. Taphorn asked petitioner to limit her personal telephone calls. Petitioner's duties in quality assurance were significantly different from her duties under Leslie.

Lori Sauter, the trauma nurse coordinator, stated that petitioner was entering data from the charts at only half the desired rate, she was away from her desk frequently, and she was given written warnings about her poor performance. Sauter audited petitioner's work, and petitioner was making errors at a rate of 50%. Sauter related this to petitioner. Sauter also observed petitioner having long, nonwork-related, telephone conversations, but Sauter never saw Holly Huffman having long telephone conversations. Sauter took over petitioner's duties when petitioner was discharged.

Gerry Jenich became the director of emergency and prehospital services in March 1991. When he met with petitioner, she informed him that she was accustomed to having her own work space, telephone, and typewriter. Jenich got those things for petitioner. He also gave her more computer time when she asked for it. Both petitioner and Huffman were given daily tutoring on the use of the computer. Petitioner was given additional instruction by Matt Lundquist, but she still made mistakes in entering data. Petitioner was given a written warning about personal telephone calls and was asked to limit those calls to five minutes, yet she continued to spend 15 to 20 minutes on calls. Everyone in the department was asked to limit the length of personal telephone calls. Petitioner often sat at her desk for several hours in the afternoon stating that she had finished her work and had nothing to do. Jenich gave her a written warning in July 1991 for poor performance because petitioner was not doing the job. On August 9, 1991, he gave her 30 days to find a job in another department.

Nicky Gerardi, the quality assurance coordinator for nursing, stated that from 1989 to September 1990 petitioner split her time between the quality assurance department and the trauma department. Petitioner made many spelling errors in typing reports and lost trauma information on computer disks. The telephone log showed that petitioner received many telephone calls from her daughter.

Linda DePorter, the acting director of prehospital trauma services, stated that petitioner returned to the emergency medical services department in September 1990 and did not receive an evaluation for more than one year. Petitioner made mistakes entering information into the trauma registry and had problems relating to the staff.

Patty Borsini, the P.C. coordinator, stated that petitioner did not accept computer training when Borsini offered it. Huffman did not need training. Although petitioner's long fingernails interfered with her job, she did not cut them when she was asked to do so.

Matt Lundquist, the computer specialist, gave petitioner extensive training on the computer. She did not always "catch on" to

the instruction. Huffman did not have the problems with computers that petitioner had.

Debbie Jurs, a nurse, stated that she tried to help petitioner improve her performance.

In addition to the statements of witnesses, the parties submitted documentary evidence. Among the documents were two memos, dated August 24, 1990, to Jerry Nash, the hospital administrator. The first, from Michael Parker, the medical director of emergency and trauma services, recommends that a position be created for petitioner in the trauma services department. The second, from Sue Taphorn, the director of quality assurance and risk management, sets forth a list of duties and responsibilities for a new trauma clerk position which could be created for petitioner. The proposed duties of the position included:

"1. Collect trauma registry data from trauma charts. (Presently collected by nurses in the ER and paid as extra hours)

2. Enter data on trauma registry computer and send to State.

3. Prepare reports for Director of Trauma Services, Director of ER etc.

4. Maintain trauma log and statistics.

5. Collect trauma criteria for QA studies.

6. Maintain trauma correspondence to all areas needing information.

7. Maintain mailing list and correspondence to Regional Trauma members.

8. Preform [sic] secretarial duties for new Nursing Director, Director of Trauma and Director of ER.

9. Preform [sic] QA statistics for the ER QA program."

In the comments section of the employee interview form formalizing petitioner's transfer to trauma clerk, Taphorn wrote "see memo of 8-24-90 re: duties, etc."

A memo, from Jenich to petitioner, dated July 23, 1991, states that there were several discrepancies in the patient registry records, most of which were incorrect dates and times. Petitioner had an error rate per record of 45%. The memo emphasized the importance of accurate data entry. The memo relates that petitioner responded that she had not been told what information was to be included in the registry, so it was mutually agreed that Sauter would document the registry data requirements for petitioner. In addition, Sauter and petitioner would meet regularly and Sauter would measure the accuracy of the data entry.

The "Terminal Evaluation" form dated October 1, 1991, states that petitioner was terminated because she "was unable to full fill [sic] job requirements."

Petitioner also submitted annual evaluation forms which rated her job performance as a trauma clerk at above average.

The Department's report concluded that petitioner performed secretarial duties until her position was eliminated. In 1990 her duties included entering trauma registry items in a computer and were not all secretarial in nature. She was to receive a formal performance review in November 1991, but "received an observation of poor performance" in July 1991 indicating she made typing errors, excessive personal phone calls, and had other problems. The report also found that petitioner was issued warnings about telephone calls, which were corroborated by witnesses, and petitioner was unable to provide evidence to show that "her younger comparison did the same thing." The Department therefore recommended a finding of a lack of substantial evidence.

Petitioner filed a request for review of the Department's decision. She alleged that there were factual issues which precluded a finding of a lack of substantial evidence. Specifically, petitioner asserted that all of her performance reviews were "exceptional" except the last one, which was prepared by Jenich. Petitioner contended that, although Jenich stated that she was not very proficient at word processing, her word processing skills were acceptable and that Huffman "performed at about the same level" as petitioner. According to petitioner, any shortcomings she may have had with the new computer system were "shared by the other secretary in the office," Huffman, but Huffman was not discharged. Petitioner therefore contended that there was an issue whether Jenich terminated petitioner because of her age. The Department responded that petitioner presented no evidence to refute the finding that her error rate was between 45% and 60%, which exceeded St. Anthony's acceptable accuracy rate.

The Commission first found that petitioner failed to provide any new evidence to warrant a reversal of the Department's determination. The Commission further found that the evidence showed St. Anthony did not treat petitioner differently from her similarly situated younger co-workers, and her performance evaluation and discharge were based on legitimate, nondiscriminatory reasons. The Commission therefore dismissed the charge for lack of substantial evidence.

Petitioner petitioned for rehearing, alleging that the Commission articulated an incorrect standard of review and that the Commission should not defer to the factual findings of the Department. The Commission denied the petition for rehearing, and petitioner timely filed this direct appeal. On the motion of the Commission, we allowed it leave to adopt the brief of St. Anthony.

■ Petitioner first contends that the Commission dismissed her charge based on an erroneous standard of review. She predicates her argument on the Commission's statement that it was affirming the Department's finding because petitioner "failed to provide any new and/or additional evidence that would warrant a reversal of the determination originally reached." However, we believe that petitioner has taken the Commission's statement out of context.

The Commission is empowered to review the Department's findings, and it may consider the Department's report, any argument and supplemental evidence submitted, and the results of any additional investigation. (775 ILCS 5/8—103(B) (West 1992).) The Commission reviews the factual findings of the Department to determine if substantial evidence exists to support the filing of a charge. (*Castillo v. Human Rights Comm'n* (1987), 159 Ill. App. 3d 158, 161.) The Commission must adopt the factual findings unless they are against the manifest weight of the evidence. (See *Castillo*, 159 Ill. App. 3d at 161.) Here, the Commission's order recognizes that petitioner failed to submit any additional evidence. It also found that the evidence showed St. Anthony did not treat petitioner differently from any similarly situated co-workers, and her performance evaluation and discharge were based on legitimate, nondiscriminatory reasons. We interpret its dismissal order as a determination that the Department's findings were not against the manifest weight of the evidence. We therefore turn to petitioner's main contention: whether the dismissal was an abuse of discretion.

■ The reviewing court will not disturb the Commission's decision to dismiss a complaint for lack of substantial evidence, unless that decision was arbitrary and capricious or an abuse of discretion. (*Peck v. Department of Human Rights* (1992), 234 Ill. App. 3d 334, 337.) When considering whether there is substantial evidence to support a charge, the Commission is not to resolve credibility issues or questions of fact. (See *Luckett v. Human Rights Comm'n* (1989), 210 Ill. App. 3d 169, 175.) The Commission's function is to determine whether there is enough evidence to justify the filing of a complaint. (See *Parham v. Macomb Unit School District No. 185* (1992), 231 Ill. App. 3d 764, 772-73.) It is the decision of the Commission, not the Department, which we review. *Peck*, 234 Ill. App. 3d at 338.

Petitioner's position was eliminated when she was discharged. Thus, to establish a *prima facie* case of discrimination, petitioner needed to show that: (1) she is a member of a group protected by the law; (2) she was performing satisfactorily; (3) she was discharged despite the adequacy of her work; and (4) a similarly situated employee who is not a member of the protected group was not discharged.

(*Clyde v. Human Rights Comm'n* (1990), 206 Ill. App. 3d 283, 292; see also *McGaughy v. Human Rights Comm'n* (1993), 243 Ill. App. 3d 751, 756; *Luckett*, 210 Ill. App. 3d at 179.) Petitioner established the first of these requirements, but she failed to present evidence to establish the remaining three. Petitioner failed to present evidence that she did not have an unacceptably high error rate of trauma registry, and she did not present evidence that Huffman had a similarly high error rate, or that petitioner was discharged for a reason other than the high error rate. Although the prior position and her last position may have had similar duties, there is no evidence to show that the prior position included trauma registry on the new computer system. Consequently, that petitioner's performance had been "exceptional" in her prior position does not refute the evidence that her performance in trauma registry on the new computer system was deficient. We therefore conclude that the Commission's decision of a lack of substantial evidence was not an abuse of discretion.

The decision of the Commission dismissing petitioner's complaint is affirmed.

Affirmed.

GEIGER and PECCARELLI, JJ., concur.