21 September 1999

NO. 4-98-0967

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

L. DEAN WILLIS, ) Administrative  

Petitioner, ) Review of The 

v. ) Illinois Department 

THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS,) of Human Rights

Chief Legal Counsel, and UNITED PARCEL ) No. 1997SA0916.

SERVICE, )

Respondents. ) 

_________________________________________________________________

JUSTICE MYERSCOUGH delivered the opinion of the court:

In June 1997, petitioner, L. Dean Willis, filed a com­

plaint with the Department of Human Rights (Department) against re­spon­dent, United Parcel Service (UPS).  Petitioner alleged that his employ­er, UPS, violated the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 
et
 
seq
. (West 1998)) by de­mot­ing him sole­ly be­

cause of his age.  In April 1998, the Department de­ter­mined peti­

tion­er failed to pres­ent sub­stan­tial evi­dence to sup­port his claim.  In October 1998, the chief legal coun­sel af­firmed the Department's dis­miss­al.  

Petitioner now appeals the chief legal counsel's deter­

mination to this court on di­rect ad­min­is­tra­tive re­view, argu­ing (1) the Act's pro­cedural frame­work violates due pro­cess; (2) the chief legal counsel's decision was arbi­trary and capri­cious; and (3) the Department erred in refus­ing to hear evidence alleg­ing a pattern of age dis­crim­i­na­tion against peti­tioner.  We af­firm.  

I. BACKGROUND

In early 1996, UPS assigned peti­tion­er to the position of business man­ager at UPS' facility in Quincy, Illi­nois.  As busi­ness manag­er, peti­tioner became respon­sible for directing all activities at the facility.

According to the Department's investigative report, UPS district human resource manager Gary Finke stated that he vis­ited the facility and conducted a "staff ride" in July 1996.  A staff ride al­lows upper management to meet with the drivers and to evaluate the facility's condition. Finke stated that he "discov­

ered that [the Quincy facility instituted] *** very lit­tle, if any, [of the] [b]est [g]roups [p]rogram" and Finke "told [pe­ti­

tioner] to cor­rect this." 

UPS implemented the "best groups" program in 1995.  Under the program, groups of employees worked together to ad­dress sig­nifi­cant issues such as safety and business devel­op­ment.  UPS insti­tuted the program at selected centers and sent a team to each center to educate employees about the program.  According to the investigative report, petitioner once served on such a team.  In No­vem­ber 1995, UPS sent a team to the Quincy facility for ap­

prox­i­mate­ly four months to implement the best groups pro­gram.  

According to the Department's investigative report, UPS dis­trict qual­i­ty man­ag­er and divi­sion man­ager Karl Gramm stated that he and former division manager Mick­ey Wigley met with peti­

tioner in August 1996.  They repeated Finke's di­rec­tive that peti­tion­er sched­ule and conduct best groups meet­ings.  They fur­

ther told peti­tioner that they expected him to take an active role in the meet­ings and in plan­ning best group initia­tives.  Wigley's notes of that meet­ing, appended to the investi­gative report, showed peti­tioner displayed a negative attitude with regard to the mat­ters dis­cussed during the meeting.

According to Finke, Wigley met with peti­tion­er again in October 1996.  Peti­tion­er ex­hib­ited nega­tive feel­ings to­ward UPS, and Wigley sug­gested petitioner improve his "neg­ative atti­tude as it was going to ad­versely af­fect his credi­bili­ty and his career."

In De­cem­ber 1996, Finke and Wigley visited the Quincy fa­cility.  According to Finke, they ob­served inade­quacies in sev­

eral train­ing ar­eas.  Supervi­sors com­plained they were not being prop­erly trained and were general­ly dissatisfied with re­gard to peti­tion­er's treatment toward them.  Several drivers also ap

proached Finke and Wigley with com­plaints about petitioner.  The drivers re­quest­ed that Finke and Wigley conduct a "focus group" meeting, whereby drivers could ex­press their con­cerns.  Finke scheduled a focus group meeting for Janu­ary 7, 1997.

Finke also stated that 32 out of some 40 drivers at­

tend­ed the meeting.  "Driver after driver complained about [peti­

tion­er], *** [stating petitioner] would not really listen to their con­cerns, *** refer[ring] to [them] as 'cost' rather than employ­ees[.]  [S]ome were afraid to approach [petitioner] and others did not because they knew he would not do anything anyway so why bother."

The Department's investigator spoke with several UPS em­ploy­ees, including drivers, supervisors, and managers, with regard to peti­tion­er.  Some stated they got along with petition­er and thought peti­tion­er per­formed his du­ties well.  However, many acknowledged that petitioner did not get along particularly well with some UPS employees.  Of those interviewed, no one had or pre­sent­ed any rea­son to be­lieve petitioner was trans­ferred be­

cause of his age.

According to the investigative report, on January 27, 1997, Finke and Gramm met with peti­tion­er.  Petitioner stated that Finke told peti­tion­er they were trans­fer­ring him to UPS' in­

dus­trial engi­neer­ing de­partment in Decatur, where he would hold the posi­tion of super­vi­sor.  Peti­tioner stat­ed that the move came as a com­plete sur­prise, and he re­ceived no fore­warning that he was per­forming his duties inad­equate­ly.  Accord­ing to peti­tion­er, Finke told peti­tion­er to take a few days to re­flect on the situa­

tion before report­ing to the Decatur fa­cili­ty.  

Finke stated that he, along with Gramm and district man­ager Randy Franklin, de­cid­ed to trans­fer petitioner because of his nega­tive attitude and his unwillingness to properly implement the best group program, even after being specif­ically and repeat­

ed­ly in­structed to do so.  Moreover, Finke stated that the com­

plaints from drivers and supervisors with regard to petitioner were sig­nificant enough to warrant a change.

After transferring petitioner, UPS promoted Mark Col­

lins, age 35, to the position of business manager.  Finke testi­

fied that UPS chose Collins be­cause of his work per­for­mance.  More­over, Collins had experi­ence as a supervi­sor of training and quality, which were areas Finke, Gramm, and Franklin felt needed improve­ment.

The investigator found a lack of substantial evidence existed to support petitioner's claim for the following reasons:

"1.     [UPS] has presented a legitimate non­dis­

crim­inatory rea­son in that [peti­tion­er] did not implement the [b]est [g]roup [p]rogram as he had been direct­ed and major morale problems [existed] with the em­ploy­ees and super­visors.

2.   Witness testimony indicates [petitioner] may have been the vic­tim of a conspiracy by the drivers in that they complained with the intent to get [petitioner] removed [because they did not like him] ***.  [H]owever, tes­timony does not support [petitioner's] alle­gation of age discrimination.

3.   It is uncontested that although [peti­

tioner] was demoted, his annual salary was not affected.

4.   Although there is conflicting testimony regarding [petitioner's] performance, there is no testimony given that sup­

ports [petitioner's] allegations that his demotion was due to his age."

The chief legal counsel agreed, finding "the investiga­

tion did not reveal, and [petitioner] did not present, any evi­dence that [UPS] harassed him and demoted him because of his age."  The chief legal counsel further stated that the "in­vesti­

ga­tion is de­void of evidence that [UPS] harassed [peti­tion­er] be­

cause of his age."

II. ANALYSIS

A 
prima
 
facie
 case of age discrimination is es­tablished by showing that (1) the com­plainant is a member of a protected class (age 40 or over); (2) he was doing the job well enough to meet his employer's le­giti­mate expecta­tions; (3) he was dis

charged or demoted; and (4) the employer sought a replacement for him.  
Southern Illinois Clinic, Ltd. v. Human Rights Comm'n
, 274 Ill. App. 3d 840, 847, 654 N.E.2d 655, 659-60 (1995).  

Once a 
prima
 
facie
 case of discrimination is estab

lished, "a rebuttable presumption arises that the employer unlaw­

fully discriminated against" the complainant.  
Zaderaka v. Illi­

nois Human Rights Comm'n
, 131 Ill. 2d 172, 179, 545 N.E.2d 684, 687 (1989).  To rebut this presumption, the employer "must ar­

ticu­late, not prove [citation], a legiti­mate, nondiscrim­inatory rea­son for its decision."  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.   

UPS states that it demoted petitioner because of his nega­tive attitude, his treatment toward subordinates, and his failure to properly implement the best groups program.  By ar­tic­

u­lat­ing "a le­git­i­mate, non­dis­crim­i­na­to­ry rea­son" for complain- ant's dis­charge, UPS "car­rie[d] its burden of pro­duc­tion," and the pre­sump­tion of unlaw­ful dis­crimi­nation fell.  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.  Petition­er was there­fore compelled to show that UPS' ar­ticulated reason "was not its true rea­son, but was instead a pretext for unlaw­ful dis­crimination."  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.  Petitioner's burden in this re­gard was part of his ulti­mate bur­den to prove that UPS unlaw­fully dis­crim­inated against him, which remained with petitioner "at all times."  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.

Prior to the amendments within Public Act 89-370 (Pub. Act. 89-370, eff. August 18, 1995 (1995 Ill. Laws 3868, 3873) (see 775 ILCS 5/7-101.1 (West 1996))), a claimant sought re­view of the Department's dis­miss­al of a dis­crimination charge for lack of substantial evi­dence with the Illinois Human Rights Com­mission (Commission).  775 ILCS 5/8-103(A) (West 1994).  How­ever, the prior law did not afford claimants a full hearing be­fore the Commis­sion.  After filing a re­quest for review, the Commis­sion could consider the Department's report and investiga­tion and any addi­tional evidence timely sub­mitted, and if neces­sary, ap­point a hear­ing offi­cer to con­duct a hear­ing on a fac­tual dis­pute.  775 ILCS 5/8-103(B) (West 1994).

As a result of the amendments within Public Act 89-370, the Department's dismissal of a discrimination claim is no longer reviewed by the Commission, but instead is reviewed by the chief legal coun­sel of the Department.  775 ILCS 5/7-101.1(B) (West 1996).  Under the amend­ment, the chief legal counsel performs the same function as that formerly executed by the Commission.  In other words, after claim­ants fil­e a re­quest for re­view, the chief legal coun­sel may con­sider the Department's re­port and investi­

gate any addi­tional evidence time­ly submitted.  The chief legal coun­sel has discre­tion to appoint a staff at­tor­ney to con­duct an investi­ga­tion into a disputed factual issue.  775 ILCS 5/7-101.1(B) (West 1996).  Moreover, the chief legal counsel per­

forms the same procedur­al func­tion in reviewing a dismissal of a claim as was formerly delegat­ed to the Commis­sion.  
Roedl v. Midco In­terna­tional
, 296 Ill. App. 3d 213, 218, 694 N.E.2d 179, 182 (1998).  Like the pre-1996 Act, a claimant is not afforded a full hear­ing be­fore the chief legal counsel.  Finally, in chang­

ing the entity with au­thor­i­ty to hear re­quests for re­view, the 1995 amend­ments did not change the ex­tent of that au­thority or other­wise change the type of review proceed­ing that a complainant received when filing such a re­quest.

A. Due Process

Illinois courts have repeatedly rejected due process challenges to the pre-1996 Act and its procedures.  See 
Gayle v. Human Rights Comm'n
, 218 Ill. App. 3d 109, 112-13, 578 N.E.2d 144, 147-48 (1991); 
Luckett v. Human Rights Comm'n
, 210 Ill. App. 3d 169, 176-78, 569 N.E.2d 6, 11-12 (1989); 
Jabbari v. Human Rights Comm'n
, 173 Ill. App. 3d 227, 230-34, 527 N.E.2d 480, 482-

84 (1988).  However, in Public Act 89-370, the legisla­ture al­

tered the proce­dur­al framework of the statute.  Petitioner argues that the amended Act deprives him of due process.  We dis­agree.

Petitioner first argues that the Department failed to conduct a "full investigation" as required by section 7A-

102(C)(1) of the Act (775 ILCS 5/7A-102(C)(1) (West 1998)) be­

cause it did not dis­cuss petitioner's job performance specifical­

ly with Wigley.  Peti­tion­er con­tends that be­cause Wigley acted as petitioner's imme­di­ate su­per­vi­sor through Decem­ber 31, 1996, Wigley is the only person in a posi­tion to accu­rately char­acter­

ize petitioner's perfor­mance, and Wigley never ex­pressed any dissatisfaction with petitioner's perfor­mance.  Fur­ther, because Finke and Gramm made the deci­sion to de­mote peti­tion­er on January 2, 1997, peti­tioner argues Finke and Gramm had no firsthand knowl­edge of petitioner's per­for­mance.  Therefore, according to petitioner, UPS' reliance upon petitioner's failure to implement the best groups program, peti­tioner's alleged nega­tive attitude, and the complaints from peti­tioner's subordinates is a mere pre­

text for UPS' decision to de­mote petitioner because of his age.

We reject petitioner's contention that the Department violated due process by failing to conduct a full inves­ti­ga­tion insofar as it did not talk to Wigley.  The inves­tigator had ac­

cess to Wigley's notes, where Wigley described petitioner as having a negative atti­tude.  More­over, petitioner does not argue that Wigley would have of­fered any evidence to substantiate peti

tioner's claim that UPS de­moted him be­cause of his age.  

Furthermore, Wigley was not the only person with knowl­

edge of petitioner's job per­for­mance.  As the chief legal counsel recog­nized, UPS had prob­lems with petitioner's perfor­mance long before Janu­ary 2, 1997, and Finke was aware of these problems.  Both Finke and Gramm ob­served petitioner's fail­ure to implement the best groups pro­gram, even after being spe­cifically instructed to do so on multi­ple occa­sions.  More­over, Finke stated that em­

ploy­ees at the Quincy fa­cil­ity filed five griev­anc­es in 1996, and none in 1997, bol­ster­ing UPS' con­tention that peti­tion­er lost all credi­bility with his subordi­nates.  Accordingly, we find that the Department's investigation did not deprive petitioner of due process.

Petitioner next argues due process requires that he be allowed to compel witnesses to testify at the investigatory stage.  We dis­agree.  While due process re­quire­ments apply to ad­

min­is­trative proceed­ings (
Abrahamson v. Illinois Department of Pro­fes­sional Regu­lation
, 153 Ill. 2d 76, 92, 606 N.E.2d 1111, 1119 (1992)), the full panoply of judicial procedures does not apply to the fact-finding inves­tigation.  
Jabbari
, 173 Ill. App. 3d at 233, 527 N.E.2d at 483; 
Hannah v. Larche
, 363 U.S. 420, 442-43, 4 L. Ed. 2d 1307, 1321-22, 80 S. Ct. 1502, 1514-15 (1960).  Such proce­dural rights, es­sen­tial to a judicial or qua­

si-judi­cial proceed­ing, are inap­pli­cable in fact-finding or in­

vestiga­tive proceed­ings before the Depart­ment.  
Folbert v. De

partment of Human Rights
, 303 Ill. App. 3d 13, 23, 707 N.E.2d 590, 597 (1999); 
Jabbari
, 173 Ill. App. 3d at 233, 527 N.E.2d at 483-84.  The first district in 
Folbert
 recent­ly re­ject­ed a com

plainant's claim that due process guarantees the right to compel witnesses
, find­ing that complainant's argu­ment "fails to recog

nize the difference be­tween an in­ves­tiga­tory and an adju­di­cato­ry agen­cy."  
Folbert
, 303 Ill. App. 3d at 22, 707 N.E.2d at 597.  We agree that due pro­cess guarantees no such right.  Peti­tioner is pro­ce­durally pro­tect­ed at the in­ves­tiga­to­ry stage by the re­quire­

ment that the inves­tiga­tors file a re­port with the Depart­ment (775 ILCS 5/7A-102(D)(1) (West 1998)), by the right to request re­view of the dis­missal by the chief legal coun­sel (775 ILCS 5/7A-102(D)(2)(a) (West 1998)), and ulti­mate­ly the right to judi­

cial review.  
Webb v. Lustig
, 298 Ill. App. 3d 695, 703, 700 N.E.2d 220, 225 (1998).

Peti­tioner also argues that the amended act's procedur­

al structure violates due process be­cause it al­lows an ad­min­is­

tra­tive agency to review it­self.  Peti­tioner fails to explain ade­quate­ly how this change offends due process.  In de­ter­min­ing what pro­cess is due, courts bal­ance (1) the pri­vate inter­est that will be affect­ed by the offi­cial ac­tion; (2) the risk of errone­

ous depri­vation of such inter­est through the proce­dures used and the prob­able value, if any, of additional or sub­stitute procedur­

al safe­guards; and (3) the government's in­ter­est, includ­ing the function in­volved and the fiscal and ad­min­is­trative bur­dens that the addi­tional or substi­tute procedure re­quirement would entail.  
Mathews v. Eldridge
, 424 U.S. 319, 334-35, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902-03 (1976); 
Stratton v. Wenona Communi­ty Unit District No. 1
, 133 Ill. 2d 413, 433, 551 N.E.2d 640, 648 (1990).  The court in 
Folbert
 con­ducted a lengthy and thorough analysis of these fac­tors and de­termined that the chief legal counsel's role in the amended Act provides complain­ants with adequate pro­cess.  See 
Folbert
, 303 Ill. App. 3d at 23-24, 707 N.E.2d at 598.  The amend­ment mere­ly sub­sti­tutes one ad­min­is­tra­tive enti­ty for anoth­

er before al­lowing charging par­ties ac­cess to judi­cial re­view.  The amend­ment does not alter the na­ture of the in­vesti­ga­tory proceed­ings by the Depart­ment and adju­dica­tive pro­ceedings by the Com­mission, nor does it change the inves­tiga­tive role of the Depart­ment.  
Folbert
, 303 Ill. App. 3d at 24, 707 N.E.2d at 598.  Moreover, the "'ultimate safeguard [to due pro­cess, the] right to judi­cial review[,]'" still exists.  
Jabbari
, 173 Ill. App. 3d at 234, 527 N.E.2d at 484, quoting 
Klein v. Fair Employ­ment Practic­

es Comm'n
, 31 Ill. App. 3d 473, 483, 334 N.E.2d 370, 377 (1975).  There­fore, we agree with the hold­ing in 
Folbert
 that the chief legal counsel's role under the amended Act is constitu­tion­al.  We also note that other courts have found this type of frame­work con­sistent with due pro­cess.  See, 
e.g.
, 
Withrow v. Larkin
, 421 U.S. 35, 47-50, 43 L. Ed. 2d 712, 723-25, 95 S. Ct. 1456, 1464-66 (1975); 
Hearne v. Board of Education of the City of Chi­ca­go
, 996 F. Supp. 773, 777-78 (N.D. Ill. 1998).  

Petitioner also argues that the amended Act allows the chief legal counsel to weigh evidence and as­sess cred­i­bil­i­ty.  Peti­tioner argues that under this structure, the chief legal coun­sel as­sumes a quasi-judi­cial or adju­di­ca­tory function, with­

out ac­cord­ing peti­tioner any compo­nents of the rights at­tached to an adju­dica­tive hearing, thus violating due process.  We dis

agree.  Again, petitioner fails to differentiate the characteris­

tics of investigatory and adjudicatory proceedings.  As this court stated in 
Webb
, "[u]ntil a complaint is issued by the De­

partment, the proceedings are investigatory (determining whether the charge should be brought) and not adjudicatory (determining whether the charge has been proved).  The Act gives those sepa­

rate functions to separate agencies, the Department and the Human Rights Commis­sion."  
Webb
, 298 Ill. App. 3d at 703, 700 N.E.2d at 225.  At the investigatory stage, the full panoply of judicial procedures does not apply.  
Jabbari
, 173 Ill. App. 3d at 233, 527 N.E.2d at 483.

B. Finding of No Substantial Evidence

Petitioner argues the Department erred in its find­ing of no sub­stantial evidence to support petitioner's claim.  The De­partment is authorized to dismiss a complaint of civil rights violation for lack of substantial evidence.  775 ILCS 5/7A-102(D)(2)(a) (West 1998).  "Substantial evidence is evidence which a reason­able mind accepts as sufficient to support a par­

ticular conclu­sion and which con­sists of more than a mere scin­

tilla but may be somewhat less than a preponderance."  775 ILCS 5/7A-102(D)(2) (West 1998).  A petitioner's discrimination charge consisting of mere specula­tion and conjecture does not constitute substantial evi­dence.  See 
Roedl
, 296 Ill. App. 3d at 219, 694 N.E.2d at 183.

The chief legal counsel possesses the same reviewing authority as was formerly assigned to the Commission.  
Roedl
, 296 Ill. App. 3d at 218, 694 N.E.2d at 182.  There­fore, the ap­propri­

ate stan­dard of review is whether the finding of no sub­stantial evi­dence was arbitrary or capricious or amounted to an abuse of dis­cretion.  
Webb
, 298 Ill. App. 3d at 704, 700 N.E.2d at 226.  Our review is of the chief legal counsel's deci­sion, not the decision of the Department.  
Marinelli v. Human Rights Comm'n
, 262 Ill. App. 3d 247, 253, 634 N.E.2d 463, 469 (1994).  The re­

view­ing court can­not re­weigh the evi­dence or sub­sti­tute its own judg­ment for that of the chief legal counsel.  See 
Roedl
, 296 Ill. App. 3d at 218, 694 N.E.2d at 183.  The chief legal coun

sel's find­ings are enti­tled to defer­ence, espe­cial­ly with re­gard to cred­ibil­i­ty determi­na­tions.  See 
Folbert
, 303 Ill. App. 3d at 26, 707 N.E.2d at 599. 

Petitioner alleges that Finke and Gramm decided to demote petitioner on January 2, 1997.  There­fore, according to petitioner, UPS intended to use the January 7, 1997, focus group meet­ing as a device to cre­ate 
ex
 
post
 
facto
 jus­tifi­ca­tion for peti­tioner's demotion.  The record does not support petitioner's con­tention.  According to the Department's investi­ga­tive report, driv­ers ap­proached Finke in December 1996 with their con­cerns about peti­tion­er, and re­quest­ed the meeting at that time, 
i.e.
, 
be­fore
 Finke and Gramm decided to demote petitioner. Moreover, Finke be­came aware that the supervisors were also unhappy with peti­tioner in Decem­ber 1996.  While the meeting gave drivers an opportunity to voice their concerns more fully, Finke and Gramm were aware of the significant problems at the Quincy facility 
prior
 to the January 7, 1997, meeting.  Therefore, we reject petitioner's argu­ment that UPS used the focus group meeting as a device to "gather 'dirt' against" petitioner.

Petitioner also argues that Gramm and Finke made sever­

al di­rect references to age in conversations with peti­tion­er, and expressed their desire to "fill management openings with 'young' persons."  Specifically, petitioner alleges that Finke and Gramm asked petitioner "about his retirement plans."  In contrast, Finke and Gramm both stated that 
petitioner
 raised the issue of re­tire­ment.  As the chief legal counsel determined, "the in­vesti­

gation did not reveal that [UPS] asked [petitioner] about his retirement plans.  Finke and Gramm stated it was [petitioner] who began discussing his retirement home."  Petitioner's conten­tion is essentially based upon his own word against that of two other peo­ple.  Petitioner's opinion that Finke and Gramm are not worthy of belief is in­suffi­cient to support a reversal of the chief legal counsel's determi­nation.  See 
Roedl
, 296 Ill. App. 3d at 219, 694 N.E.2d at 183.

Nothing in the record supports a find­ing that the chief legal counsel's decision was arbitrary or capri­cious.  Petitioner offers no persuasive evidence to substan­tiate his claim of age discrimination.  Furthermore, ample evi­dence suggests that UPS had le­giti­mate reasons for demoting peti­tioner.  Petitioner failed to prop­erly implement the best groups pro­gram, even after repeated di­rectives to do so.  Wigley deter­mined that petitioner exhibited a negative attitude.  Fi­nal­ly, petitioner's sub­or­di­

nates com­plained of their inadequate training and petitioner's treat­ment to­ward them.  We also note that Franklin, one of the peo­ple in­volved in the decision to demote peti­tioner, is the same age as petitioner.  In light of the def­er­ence ac­cord­ed to the chief legal counsel's cred­ibili­ty deter­mina­tions (see 
Folbert
, 303 Ill. App. 3d at 26, 707 N.E.2d at 599), we find peti­tion­er of­fers no per­sua­sive argu­ment to indicate that UPS' reasons for demoting peti­tioner were a pre­text, nor that the chief legal counsel's de­ter­mi­nation was arbi­trary and ca­pri­cious.

C. Refusal to Hear Pattern Evidence

At the fact-finding conference, the Department refused petitioner's attempt to proffer evi­dence that another UPS employ­

ee re­ferred to petitioner as "Pops."  Although petitioner raised this argu­ment to the chief legal coun­sel, it was not addressed in the chief legal coun­sel's determina­tion.  Peti­tion­er ar­gues that he attempted to explore this evi­dence not as a sepa­rate viola­tion but, rath­er, to show pat­tern, intent, and common scheme and de­

sign.  Therefore, petitioner argues, the evidence should have been taken.

Petition­er is cor­rect in his as­sertion that pattern evi­dence is sometimes ad­mis­si­ble.  See, 
e.g.
, 
People v. McKibbins
, 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824 (1983).  How­

ev­er, in this case, petitioner does not assert that Finke, Gramm, or Frank­lin (
i.e.
, the persons mak­ing the deci­sion to de­mote peti­tioner) called petitioner "Pops."  Wheth­er some­one else work­ing at UPS called petitioner "Pops" is irrel­e­vant.  See 
Testerman v. EDS Technical Products Corp.
, 98 F.3d 297, 301-02 (7th Cir. 1996); 
Fuka v. Thomson Con­sumer Elec­tron­ics
, 82 F.3d 1397, 1403 (7th Cir. 1996).

III. CONCLUSION

For the foregoing reasons, the decision of the chief legal counsel is affirmed.

Affirmed.  

COOK and STEIGMANN, JJ., concur.